15 455
5ɔ 773

# DECISIONS

#### OF THE

# SUPREME COURT OF FLORIDA.

## JANUARY TERM, 1876.

DANIEL P. HOLLAND, APPELLANT, VS. THE STATE OF FLORIDA ET AL., RESPONDENTS.

1. The general rule is, that the plaintiff in execution, purchasing at a sale under his execution, takes the property subject to such prior liens and equities as affected it in the hands of the defendant in execution when the judgment was recovered. This rule applies to the sale of a franchise under a statutory power.

2. The Constitution of the State of Florida grants the power to the Legislature to issue bonds to perfect a system of internal improvements, embracing well-defined lines of railway in process of construction. The Constitution limits, also, the power of taxation. Any further power in reference to internal improvements is not necessary or essential to the purposes of government; such grant is a limitation upon the power of the Legislature in the matter of granting aid to railways. Where the constitution of a State grants the power to the Legislature to issue bonds for specified purposes, such grant is, under the circumstances stated, a limitation of the power when exercised in reference to those purposes.

3. A limitation upon the power of the Legislature in the matter of pledging the credit of the State to aid *quasi* public works, such as railways, should be strictly construed, and an act of the Legislature authorising an issue of State bonds in aid of a line of railway differing essentially and fundamentally from the line to which the power thus to aid was limited by the Constitution, is in this respect unconstitutional and void.

4. Where the line to which aid was authorized to be extended by the Constitution was part of a *State system*, having its several termini at points within the State, a line of railway, embracing a part of the

2

system but having one of its terminal points on the boundary line of another State, looking to a connection with the ports of another State, is a line of railway essentially and fundamentally differing from the line to which aid was authorized to be extended.

5. Under the provisions of the act of the Legislature authorizing an exchange of State bonds with certain railroad companies, the State was to occupy two relations to those who bought its bonds from the company. The first was that of a debtor to the holder, and the second was that of a trustee holding the bond of the company and the lien created by the act to secure payment to the party who advanced money to the company. The Legislature had no authority to create the first relation. It did have power to enact the second.

6. The State is prohibited by the Constitution from becoming "a joint owner or stockholder in any company, association or corporation." The State may grant such franchises to others. She cannot herself purchase, own, or operate a line of railway.

Appeal from Duval Circuit Court, Fourth Judicial Circuit.

The points in this case are fully explained in the briefs of counsel and the opinion of the court.

*D. P. Holland* in his own right and counsel for appellant.

This is an appeal from a decretal order made by the Judge of the Fourth Judicial Circuit, Duval Circuit Court, sustaining the demurrer of the plaintiffs to the answer of the defendant, Daniel P. Holland.

From this order, Holland appeals to this court, and assigns the following as error:

1. That the court below erred in sustaining the demurrer of the plaintiffs to the answer of defendant Holland.

2. That the complaints in this action do not state facts sufficient to constitute a cause of action. And that the said action should be dismissed for the reasons aforesaid.

This was an action commenced under the Code for equitable relief by the plaintiffs, against the Jacksonville, Pensacola & Mobile Railroad Company and others, in March, 1872, who prayed judgment for $572,000 and costs against

said company for a balance claimed to be due the Trustees of the Internal Improvement Fund on a sale of the Pensacola and Georgia Railroad, and the Tallahassee Railroad, in March, 1869, by the Trustees of the Internal Improvement Fund, at which sale one Dibble and associates were the purchasers; and also for injunction restraining the defendants from selling or disposing of railroad stock in that company and in the Florida Central Railroad Company, and for a receiver.

On this complaint the court appointed one Greely a receiver of the whole line of railroad from Jacksonville to Chattahoochee, and from Tallahassee to St. Marks, and the receiver took possession.

In June, 1872, plaintiffs amended their complaint. And over two years thereafter to-wit: on the 24th day of March, 1874, plaintiffs filed a supplemental complaint, and made Daniel P. Holland a defendant, Holland being at this time in possession of and operating the railroad west of Lake City, and claiming title thereto by virtue of a conveyance made to him as purchaser at a judicial sale by the United States Marshal by virtue of an execution issued against said Jacksonville, Pensacola & Mobile Railroad Company in favor of said Holland, at which sale Holland was the purchaser; and while he, Holland, was thus in possession, the plaintiffs filed their supplemental complaint, made him a party defendant to said action, obtained various orders against him, and forcibly dispossessed Holland under so-called writs of assistance, and put said Greeley in the possession of said railroads, and obtained a judgment in favor of the Trustees. All of which orders, as well as the original order appointing Greeley receiver, were by this court vacated and set aside, and the cause remanded to the Duval Circuit Court "to be heard on the issues made, or to be made by the pleadings, and for such other disposition as is conformable to law."

After the mandate of this court, Holland, on the first of

May, 1875, filed his answer to said action, to which answer the State of Florida demurred, on the ground "that said answer does not state facts sufficient to constitute any defence in law. Whereupon, and for divers other good causes of demurrer appearing upon the face of said answer, the plaintiffs pray judgment, &c."

This demurrer was sustained by the court—and from this decretal order Holland appeals to this court.

The complaints allege—

1. That the Trustees of the Internal Improvement Fund sold the Pensacola & Georgia Railroad on the 20th March, 1869, for $1,220,000, and the Tallahassee Railroad Company for $195,000; and that Dibble and associates paid all the purchase money except about $472,000, which, with interest thereon, is still due. That a check for the amount was given by the purchasers to the trustees, and by them accepted; that they then delivered the check to their fiscal agent, George W. Swepson, who receipted to the trustees for the same. That the giving and receiving of the check was a fraud.

2. That this sale was had under and by virtue of the internal improvement act of 1855.

That the purchasers, Dibble and associates, were afterwards incorporated as the Tallahassee Railroad Company, which last company afterwards consolidated with the Jacksonville, Pensacola & Mobile Railroad Company, and this last company the plaintiffs seek to obtain judgment against and a sale of the franchises and property of this railroad company to pay the balance claimed to be due on said sale by the trustees.

3. The State of Florida claims to have issued to the Jacksonville, Pensacola & Mobile Railroad Company three millions of bonds of the State of Florida, issued by virtue of the act of 1870, entitled an act to alter and amend an act to perfect the public works of this State, approved June 24th, 1869, and to have exchanged three millions of State of

Florida bonds, for three million dollars of bonds of the Jacksonville, Pensacola & Mobile Railroad Company. That said railroad bonds are now held by the State, and that interest is due and unpaid thereon from the first day of January, A. D. 1870, at eight per cent. And that the State has a first lien and mortgage on said Jacksonville, Pensacola & Mobile Railroad Company, its franchises and property, superior to all others, and that M. S. Littlefield, the President of the company, made the certificate under oath as required by the statute, and that the exchange of bonds was made with him by the State. And alleges consolidation with the Tallahassee Railroad Company, and with the Florida Central Railroad Company. Numerous other matters with great prolixity and verbiage are set out, the object of the pleader being as unascertainable by any known rule of pleading as the prayers are singular, which prayers in short are, for sale of the railroad from Jacksonville westward, as the property of the said Jacksonville, Pensacola & Mobile Railroad Company; that all this company's property and franchise shall be sold *subject* to the right of the trustees under the act of 1855 to enforce the payment of the said balance. And a further condition that the purchaser buys the road subject to the claim of the State of Florida growing out of said exchange of securities as fully and amply as though such had not taken place.

On 24th March, 1874, plaintiffs filed "supplemental complaint and petition," making other parties defendants, and amongst them Holland is made a defendant.

This supplemental complaint alleges "that since the filing of the amended complaint and the subsequent proceedings therein, Daniel P. Holland, heretofore, to-wit: on or about the second day of December, A. D. 1872, recovered a judgment against the Jacksonville, Pensacola & Mobile Railroad Company, hereinafter called the defendant company, in the Circuit Court of the United States, Northern District of Florida, for the sum of about sixty thousand dollars, and

caused executions to issue thereon, and the same to be levied upon the equity of redemption of this railroad and appurtenances of said defendant company lying west of Lake City, Columbia county, and that on the first Monday of May, A. D. 1873, the marshal of the United States sold said property so levied on, and that said Daniel P. Holland became the purchaser.

"2. That said Holland at such sale paid no consideration for the property purchased, but that the amount of his bid therefor was credited upon said executions or is yet to be credited.

"3. That soon after such purchase said Holland acquired possession of the said railroad of defendant company, and rolling stock, and appurtenances, situated west of Lake City aforesaid, and has ever since retained possession thereof, and received the income and tolls thereof, and is now in possession thereof, receiving the rents and tolls thereof, to the great wrong and injury of plaintiffs, and in violation and contempt of the order and proceeding of this court in this case, which will more fully appear by inspection of the record thereof, reference being thereto had."

The supplemental complaint also makes the bill in the Supreme Court of the United States, and Holland's answer thereto, a part of this supplemental complaint, and alleges that Holland's actions are in violation of rights of the plaintiffs. Various other matters not connected with the suit, relative to stock and the receivership of Greeley, are set out in the supplemental complaint.

The plaintiffs then pray, "That a proper judgment and decree may be entered in favor of the plaintiffs, the Trustees of the Internal Improvement Fund of Florida, for the balance of the purchase money alleged to be due in said complaints, and in behalf of the State of Florida for interest due and unpaid on said four millions of bonds. That such other and different relief may be granted as may seem just and equitable."

And after praying for special orders against Holland and several other defendants for attachments for contempt, and other orders, and that the receiver be put in possession, (which was done, and Holland without notice or hearing forcibly dispossessed, which this court afterwards set aside and reversed,) they then pray "that said defendants may be restrained from intermeddling with such possession of said property, and the said defendants may be compelled to account for the income of said property in their possession."

Holland's answer alleges—

1. That on the 22d December, 1872, he recovered judgment in the United States Circuit Court of Florida against the Jacksonville, Pensacola & Mobile Railroad Company for the sum of $62,233.55 and costs.

2. That execution issued thereon on the 14th December, 1872, which was levied on the 10th of February, 1873, upon the equities of redemption of the railroad company, and "also upon all the right, title and interest of the said Jacksonville, Pensacola & Mobile Railroad Company, has, or is possessed of, in the franchise, railroad or railroads, rolling stock, depots, warehouses, machinery, real and personal property of any and all kinds whatsoever, lying, or being, or situated in the said Northern District of Florida."

3. That on the 5th of May, the marshal, having first complied with all the requirements of law, sold by virtue of the execution the property set forth in the levies, and the same was knocked down to Holland, he being the best and highest bidder, for $20,000, which Holland receipted to the Marshal for to apply to said execution in satisfaction thereof *pro tanto*. That Holland paid more than $300 costs.

4. That the marshal made and delivered a deed to the property to Holland, which deed is copied and made a part of the answer.

5. That subsequently Holland entered into the full possession and control of the property, so conveyed to him by

the marshal, until he was dispossessed by forcible execution writs, issued in this action.

6. That he is the legal, equitable, real and absolute owner of all the railroads mentioned in the complaints, between Lake City and Quincy, Tallahassee and St. Marks, and the Monticello branch, and of the franchises and property and things so sold to him.

7. And that he is advised by counsel that the same is not, nor is there any part thereof subject to any lien or encumbrance, stated, indicated or set forth by or in any of the complaints in this action, and that none of the bonds mentioned in this action constitute any lien or charge on the property purchased by Holland.

And on information and belief, he alleges and charges that none of the bonds or coupons indicated or mentioned in this action are, or constitute any lien, charge or encumbrance on the property bought by him, either prior or subsequent to the right, interest or title that this defendant acquired at and by the sale aforesaid.

8. On information and belief, that the Jacksonville, Pensacola & Mobile Railroad Company never executed any mortgage or deed of trust to the State of Florida upon the property purchased by Holland to secure any of the bonds mentioned in this action, and as advised by counsel that the mere execution and delivery to the State of Florida of the bonds described in the action, did not create any lien or encumbrance on the property Holland purchased.

9. That the State of Florida has no legal or equitable lien on said property so purchased, or on any part or portion thereof, but only a general, unsecured indebtedness against the railroad company.

10. That all said bonds, pretended to be issued by said company, "are absolutely null and void," by reason that there was no constitutional authority to issue said bonds, which are alleged to have been exchanged by the State for said company's bonds, and therefore said bonds are void,

and that said State has given no consideration for, and acquired no right or interest in the bonds so alleged to have been issued by said company.

11. That the statute provided that the bonds and coupons should be payable at such place as the Governor should designate in the city of New York. And defendant says on information and belief, that the Governor has never designated any such place where they were to be, or could be paid, and submits that until such place be designated, no default can be alleged against the company.

12. On information and belief, that in point of fact all the interest called for and payable on said bonds issued by the railroad company, or the coupons, and until after the commencement of this action, has been paid by said railroad company, and therefore the railroad company was not in default when this action was commenced. That if any of the bonds or coupons maturing before commencement of this action are now in possession of the State, they ought to be delivered up and cancelled, the said company having paid the corresponding coupons on said State bonds, which in equity amounts to a payment of said coupons on said company's bonds.

13. That on information and belief, no part of the consideration money of the purchase made by Dibble and associates remains due and unpaid, but that Dibble and associates paid in full the sum which they bid at the sale mentioned, by which they became the purchasers.

14. Denies all fraud, combination, &c.

15. Denies that Greeley ever was receiver of any part of the property purchased by defendant, because the court had no jurisdiction to appoint a receiver.

16. That at the time of the levy and sale to Holland, the property was "in the actual possession of, operated and managed by the said railroad company, and was not in the actual or constructive possession of any receiver of any court

having jurisdiction over the property purchased by defendant."

17. Defendant admits the corporate existence of the Jacksonville, Pensacola & Mobile Railroad Company, and that it acquired the road east of Quincy by consolidation with the Tallahassee Railroad Company, and also by purchase from one John B. Clark.

18. On information and belief, that the State of Florida, never in law or legal effect, ever issued or delivered said State bonds so called, and therefore never exchanged any State bonds with said railroad company.

19. And that the said Jacksonville, Pensacola & Mobile Railroad Company was not indebted to said State of Florida at the commencement of this suit.

20. On information and belief, that the President of said Jacksonville, Pensacola & Mobile Railroad Company never made the certificate under oath as required by the act of 1870, without which no State bond could lawfully be delivered to the said railroad company, or the State receive as consideration therefor any bond of said railroad company.

21. Denies every allegation set out against defendant to affect the rights and title of this defendant, not particularly before mentioned or denied, and prays that he be dismissed, and recover judgment of this court.

It is contended by the appellant, that the demurrer admits the facts in the answer—the facts thus admitted being, in short, that Holland by deed acquired and took the possession of the franchises and property of the Jacksonville, Pensacola & Mobile Railroad Company in the deed mentioned; said deed being executed by the marshal, by virtue of an execution sale made in accordance with the requirements of law first had from a court of competent jurisdiction over the persons and subject matter to satisfy a judgment; and by virtue of an execution issued and levied in accordance with law, and a sale made thereunder in accordance with law, at which sale Holland became the pur-

chaser, received the deed of the officer, paid the consideration or bid, entered into the possession and operated the roads, using and enjoying the franchises and property until dispossessed by writs from the court, which were afterwards declared nullities by the Supreme Court of the State, and Holland's possession thus declared to be still continuous, the act of dispossessing being done by an officer without jurisdiction.

The first question that arises from the pleadings is, did Holland by the deed of the marshal, and the sale under execution, acquire any title, and if so, what?

1. There can be no doubt but he had by these pleadings one title, to-wit: possession, or the title which is acquired by possession.

2. It is contended that Holland thereby acquired all the right, title and interest of the defendant, the Jacksonville, Pensacola & Mobile Railroad Company, in and to the franchises, real and personal property, railroads, &c., described in the deed, as fully and completely as they were owned and possessed by the railroad company and its stockholders on the day of the execution of the deed, the 11th May, 1873, and also as fully and completely as if the said railroad company and its stockholders had, for valuable consideration sold, and by deed conveyed in fee simple, under their corporate seal, the franchises and property, rights and credits of the said company enumerated in the deed.

3. That the deed of the marshal relates back to the date of the judgment, to-wit: the 2d day of December, (A. D. 1872,) One Thousand Eight Hundred and Seventy-Two; and thereby from said date avoids as against Holland, the purchaser, all intermediate or subsequent liens, or alienations.

We must look to the statutes of Florida and to this execution for the power of the writ, to see whether this corporation's property, described in the deed, could be sold and conveyed by the marshal.

Holland obtained judgment at Jacksonville, Florida, against the Jacksonville, Pensacola & Mobile Railroad Company, in the United States Circuit Court, Fifth Circuit, on the 2d of December, 1872, for the sum of $62,233.33, on which execution issued on the 14th day of December, 1872.

The writ commanded the marshal "that he levy upon the goods and chattels and equities of redemption of the said defendant, the Jacksonville, Pensacola & Mobile Railroad Company, liable to levy and sale under execution in your district, and of the lands and tenements in your district, whereof the said defendant was seized on the aforesaid day of the entry of said judgment, or at any time since in whose hands soever the same may be."

By virtue of this writ the marshal levied on the 14th of February, 1873—

1. "On the equities of redemption of the defendant company in and to its franchise, railroads, rolling stock, machinery, depots, warehouses, real and personal property of every kind and character, situated and being in the Northern District of Florida, owned by, or belonging to the Jacksonville, Pensacola & Mobile Railroad Company."

2. "Also the equities of redemption of the company in and to the railroads, and parts of road, from Lake City to Quincy, and from Tallahassee to St. Marks, together with the workshops, rolling stock, machinery, depots, real and personal property of every kind and character, acquired by the said Jacksonville, Pensacola & Mobile Railroad Company by consolidation with a corporation known as the Tallahassee Railroad Company, or by purchase from one John B. Clark, or from any other person or persons."

3. "Also all the right, title and interest of the said Jacksonville, Pensacola & Mobile Railroad Company has, or is possessed of in the franchise, railroad or railroads, rolling stock, depots, warehouses, machinery, real and personal property of any and all kinds whatsoever, lying and being or situated in the Northern District of Florida."

Holland v. The State of Florida et al.

The property thus described and levied upon was sold by the marshal on the 5th of May, 1873, Holland becoming the purchaser, crediting his bid on the execution; the marshal conveying by deed the above described property mentioned in the levy to Holland, who afterwards entered into possession.

I. It is contended that by virtue thereof, Holland acquired all the right, title and interest of the Jacksonville, Pensacola & Mobile Railroad Company in and to its franchise, real and personal property, and the equities of redemption of said company, together with all the property of every kind of said company.

Holland's judgment was a lien on the real estate of the defendant company from the day of its rendition, to-wit: the 2d December, 1872, and on the personal property of the corporation from the time the execution came to the hands of the marshal, to-wit: the 14th December, 1872.

The statute of Florida governing the same is as follows: "Every judgment at law and decree in equity, which shall be entered and pronounced in any of the courts of the State, shall create a lien, and be binding upon the real estate of the defendant or defendants." Thomp. Dig. p. 351–2; 3 Fla. 196–7.

II. The property of this corporation was liable to levy and sale under execution.

The statute of Florida is in the following words: "If any judgment at law, or decree in chancery, shall be rendered against any corporation, it shall be lawful for the plaintiff to sue out either a *distrain, or fieri facias, or elegit,* as he may think proper, and the said writs of *fieri facias* and *elegit* may be levied as well on the current money as on the goods and chattels of said corporation." Thomp. Dig. p. 354.

This act was passed in 1834, at which time realty was not liable to be sold under execution. The first part of this statute gave the writ of *fi. fa.* against corporations; the

last part of the section extended the powers of the writ so as to reach the current money of corporations, thereby increasing the powers of the writ. Ten years thereafter, to-wit: in 1844, the powers of this writ were extended in the words of the statute as follows: Lands and tenements, goods and chattels, shall be subject to the payment of debts, and shall be liable to be taken in execution and sold: Thomp. Dig. p. 355.

One year thereafter, to-wit: in 1845, the power of this writ was still further extended, viz.: "From and after the passage of this act, equities of redemption, or the legal right of redemption, in real and personal property, shall be subject to levy and sale under executions upon judgments at common law, or upon decrees in equity." Thomp. Dig. p. 355.

Thus we see that by the statutes of Florida, the writ of *fieri facias* was authorized to issue upon judgments rendered against corporations, and that the equities of redemption, goods and chattels, real and personal property of corporations, were liable to levy and sale under execution for the satisfaction of debts.

It also appears from the form and mandate of the execution issued in this case by the United States Circuit Court, that the court had issued this writ in conformity with the State practice and statutes as to writs of execution; the power to do which has been well settled by numerous authorities of the Supreme Court of the United States.

III. The Jacksonville, Pensacola & Mobile Railroad Company, by statute, held all its property, real and personal, in fee simple, and was authorized to sell the same in fee, or for a less estate, or by way of mortgage, or otherwise. It follows, therefore, that whatsoever property, right, title or interest the company could voluntarily sell, dispose of, and convey by deed, the marshal could, by virtue of said execution, sell and convey, and the purchaser would take.

1st. The Jacksonville, Pensacola & Mobile Railroad Com-

pany was created by a public statute of Florida, entitled " an act to perfect the public works of the State," approved June 24th, 1869. This statute was amended in 1870 by an act entitled " an act to alter and amend an act entitled an act to perfect the public works of the State," approved January 28th, 1870. From these statutes we find the powers, authority and liability of the defendant company.

The first section of the act of 1869 commences by declaring the object for which the Legislature created this corporation, to-wit: " Section 1. In order to secure the speedy completion, equipping, and the maintenance of a connection by railroad between Jacksonville, on the Atlantic coast, and Pensacola, on the Gulf coast, and Mobile, in Alabama, running through the State of Florida," certain persons mentioned in the act, "their associates, successors and assigns, are hereby constituted a body politic and corporate, under the name of the Jacksonville, Pensacola & Mobile Railroad Company."

The act proceeds to confer on them certain powers, and among others this power, in the following words: "May purchase and hold real and personal property, which may be necessary or useful for the purposes of the road, and sell and convey the same in fee, or for a less estate, or by way of mortgage, or otherwise." See Sec. 1, Act 1869.

The seventh section authorizes the company to hold all real property acquired by condemnation and donation in fee.

" Sec. 7. The property so assessed and paid for by said railroad company, in conformity to the provisions of this act, and all donations from any source for the same, shall forever afterwards belong to and become the property of said railroad company, its successors, in fee simple."

This company differs from all other corporations in this, 1st, that instead of an easement, the company held its property in fee, both real and personal, with power "to sell and convey the same in fee, or for a less estate, or by way of mortgage, or otherwise." 2d. That the corporate powers

and privileges, under the corporate name, were not only given to the individual persons mentioned in the act, but also to their associates, successors, and not only to them, but to "their assigns." Hence, the act specially vested all the corporate powers, franchises and privileges in the assignees, whether the estate conveyed was in fee or for a term of years, or otherwise.

This company, in order to accomplish the object of its creation, had two great powers. 1st. To build and operate a road west from Quincy to Mobile; the line of this road was designated in the 4th section of the act; this line of road was subsequently changed by the first section of the amendatory act of 1870, which prescribed that the company should "have the exclusive right for twenty years to build a railroad with one or more tracks from the terminus of the late Pensacola and Georgia Railroad, now the Tallahassee Railroad, at Quincy, Gadsden county, to the dividing line between the States of Florida and Alabama, in the direction of the city of Mobile, Alabama, running through the counties of Gadsden, Jackson, Holmes, Washington, Walton, Santa Rosa and Escambia, crossing the Pensacola & Louisville Railroad, with privilege of continuing the same to Mobile and of connecting with any railroad running to Mobile. Provided, however, that in the construction of said railroad, the line west of the Chattahoochee river shall not in any instance be run or the road built nearer than fifteen miles of the north line of the State of Florida." 2d. It might acquire, by consolidation, the roads and property of the several companies east of Quincy, which was authorized by the 14th section of the act of 1869.

Subsequently, in 1870, the corporation then owning and operating the roads between Quincy and Lake City, Tallahassee and St. Marks, called the Tallahassee Railroad Company, was consolidated with the said defendant corporation by virtue of said 14th section of the act of 1869, and, in the

words of the statute, "became one corporation under its name." See Section 14, Act 1869.

This corporation, called the Tallahassee Railroad Company, was incorporated the same day as the defendant company by a statute entitled "an act for the relief of Franklin Dibble, A. Huling, E. M. Cheney, and their associates, purchasers of the railroad from Tallahassee to St. Marks, and of the railroad from Quincy to Lake City, and incorporating the Tallahassee Railroad Company," approved June 24, 1869.

The 1st section of this act declares that the persons mentioned therein, "and their associates, and their successors and assigns, are hereby made a body politic and corporate, under the name of the Tallahassee Railroad Company, and they, their associates and assigns, as such body politic and corporate, are hereby vested with and shall be entitled to exercise and enjoy the like powers, franchises and privileges as were granted to the Pensacola & Georgia Railroad Company and the Tallahassee Railroad Company by the several acts incorporating the said Pensacola & Georgia Railroad Company and said Tallahassee Railroad Company, and with the right to hold, operate and enjoy the said railroads, under the name of the Tallahassee Railroad Company, subject to the conditions annexed to the sale of said roads by the Trustees of the Internal Improvement Fund, and by and in the name of the Tallahassee Railroad Company, they, their associates, successors and assigns, may purchase, receive and hold lands and tenements, goods and chattels of whatsoever character that shall be necessary or useful for the purposes of said railroads, and the same to grant, sell, mortgage or dispose of," &c. See Section 1, Act 1869.

The 4th section gives special powers of selling and leasing, with the limitations therein as follows:

"SEC. 4. *Be it further enacted,* That said Tallahassee Railroad Company may, when they shall see fit, rent, lease, farm out, or sell any part of the said railroads to any person or persons, corporation or corporations, upon such terms as

may be agreed upon, provided said sale, renting or leasing shall not be made to any person or persons or corporation owning any railroads out of the State of Florida."

These two statutes, passed at the same session, of the Legislature, approved the same day, having reference to the same subject, to-wit: a line of railroad running through the northern portion of the State of Florida, from Jacksonville towards Mobile, Ala., which line, at the time of the passage of these statutes, was partly completed and then operated as follows: That part of the line from Jacksonville to Lake City, a distance of 60 miles, by the Florida Central Railroad Company, and the remaining completed portion from Lake City to Quincy, 138 miles, and from Tallahassee to St. Marks, 20 miles, being operated by Dibble and associates, who had purchased the said roads, are to be taken and construed together; for the "act to perfect the public works of the State," approved at the same day as the act which incorporated Dibble and associates under the new name of the Tallahassee Railroad Company, declares the object and intent to be to secure to the public the line of railway to be completed and operated through the whole northern part of the State, and to be exclusively confined to Florida interests; and for this purpose these statutes created the defendant corporation to complete the road westward from Quincy; but prohibited the company from building the road nearer the northern boundary of the State of Florida than 15 miles, and incorporated Dibble and associates under the name of the Tallahassee Railroad Company, with new powers, among others with the right to sell or lease the completed roads east of Quincy, but prohibiting them from selling or leasing the roads to any "persons or corporation owning any railroads out of the State of Florida," and giving these two railroad companies the power of consolidation, and also granting the franchises and privileges of both companies not only to the original corporators and their successors and associates, but also to their "assigns." And also giving

each company the power to hold all real and personal property "necessary or useful for the purposes of the road," (which term, necessary, includes all real and personal property required for the construction of the road-bed, the super-structure, depots, and equipments, both real and personal, required to create, operate and maintain the roads,) and "to grant, sell, mortgage, or dispose of," the same, and in the words of the charter of the Tallahassee Railroad Company, and in the words of the public act which created the defendant company, to "purchase and hold real and personal property, which may be necessary or useful for the purposes of the road, and sell and convey the same in fee or for less estate, or by way of mortgage or otherwise."

It is evident from the words of the statute, and the whole scope of these acts, that the prime object of the Legislature was to complete this unfinished link through the State towards Mobile; to locate the same within her own territory so far from Georgia and Alabama as to make this line of railway an exclusive road for the State of Florida interests, and not to allow the roads to be owned by citizens or corporations owning railroads in other States, for fear of thereby injuring the business of Florida which this line was intended to advance, and which had its origin as far back as the year of 1855, under an act which created a railroad system for Florida, commonly called the internal improvement act. This act of 1855 was the parent statute of all the other railroad acts of Florida, and designated this line of railway in the 4th section of the act, in which it will be found the State placed the public domain in trust for certain objects, among others to aid in the construction of this line of railway; and provided that any companies then chartered, or that might hereafter be chartered, whose routes were within the line laid down in the 4th section of that act, might obtain the benefits of the act, thus giving its aid to any who would build the line or any part thereof. And by the 24th section jealously guarding the line from

foreign railroad interests by prohibiting, without the assent of all the railroad companies enjoying the benefits of the act, and the trustees created by the act, the road to be built to the northern boundary of the State west of the Alapaha river.

Therefore, the whole scope of the Legislature of Florida shows that the franchises she granted for the main line of road were not to be confined to the certain few either then owning franchises in 1855 or those designated in the act of 1869, but to any person or persons or corporation other than those owning foreign railroads who would build and operate this main line, either that which was completed in 1869 or remained to be built. Hence the State granted these franchises to the corporations, their successors, associates and assigns, and gave them the power to sell, lease, or otherwise dispose of the same, it being immaterial to the State who possessed these franchises and privileges and property so long as they, by ownership, were not interested in foreign railroads, provided thereby the State of Florida could obtain the benefits of this line of railway running through the northern portion of the State, connecting thereby the Gulf and the Atlantic; for this intent is evident from the general object of the statutes and the words used. These franchises and privileges in both cases are granted to the assigns as well as to the corporators, their successors and associates.

The word "assigns" necessarily implies the power of assignment or conveyance as it is used in those statutes. "Assigns" are those to whom rights have been transmitted by particular title, such as sale, gift, legacy, transfer or cession. Bouv. L. Dic. p. 134.

This word "assigns," came first into legal use relating to the conveyance of realty in the time of Henry I, for prior to that time the owner of lands could not sell, even that which he had purchased; but by statute of Henry I, afterwards extended by act of Henry III, if the deed specified to him, his heirs and "assigns," he might re-sell

what he had by purchase and deed thus acquired; but if, the word "assigns" was not specified in the deed, he could not sell or convey even that which he had purchased. 2 Black. Com. p. 289.

Hammond on Parties, page 117, says: "When the lord assigns the reversion, the assignee becomes lord in his room, fills the precise situation and character the other filled, and was clothed with, and is therefore entitled to the privileges annexed to that character."

In Hatley vs. Scott, Lofftus Reports, page 318, which was before Lord Mansfield, Mr. Bancroft said, "with respect to the term assigns there was no definition, as being too clear to need or admit one; however, I may take for granted by way of definition, that an assign is one who can take an assignment from a person qualified to make it."

With the language of the statutes granting the power to sell and convey in fee, or for a less estate, can there be any question that both railroad companies were authorized by statute to voluntarily sell and convey all and every kind of property owned by the corporations, and held by them under their respective charters; and in case of a sale, that the corporate franchises would pass to the purchaser, by the express terms of the charters, wherein the Legislature gave the franchises to the assigns. Hence, we hold, that in case of a voluntary sale made by either of the corporations, the vendee would be invested by the statute as purchaser, with, all the franchises, powers and privileges of the railroad company as fully and completely as if his name was set forth in the charter in the manner in which the names of the incorporators are described, and that the purchaser, under such voluntary sale, would be in the same position as any person who had by act of the corporators become their associate; or, who having bought out all interest of the incorporators named in the charter, had by sale become their "successors."

The defendant corporation acquired the roads east of

Quincy, owned and operated them under the franchise of the Tallahassee Railroad Company, by consolidation.

The Supreme Court of the United States, in Tomlinson vs Branch, 15 Wall. 465, speaking of corporations consolidated, say that while the corporate rights and franchises of the old company which appertained to its existence and functions as a corporation were merged into the new company and became extinct. "But all its rights and duties, its privileges and obligations as related to the public or to the third persons, remain and devolve upon the new company."

Hence, we see this defendant company possessed the power of sale and conveyance, not only of the franchise and property which it possessed by the act to perfect the public works, but also the franchise and property of the roads east of Quincy that it acquired from the Tallahassee Railroad Company, express power and authority to sell and convey the franchises and property having been given by both statutes to both railroad companies.

2d. What the defendant company could voluntarily sell and convey, the marshal could, by virtue of said execution, sell, and by deed convey to the purchasers each, every and all right, title and interest owned and possessed by the defendant company. Therefore, as the defendant company could, by the authority in it vested by said statutes of 1869, voluntarily sell and convey to Holland all its franchises and property acquired as aforesaid, the marshal, acting by virtue of said execution in law as the agent and attorney of the defendant company, was possessed of like power and authority.

In Lessee of Cooper vs. Galbraith, 3 Washington C. C. Reports, page 550, the court said: "The sheriff is empowered by law to convey by deed to the purchaser under an execution all the right, title, interest and estate of the defendant as fully as the defendant himself, or an attorney empowered for that purpose by him, could have done. The

officer, in fact, acts as such attorney, appointed for that purpose by law. The purchase money is paid to the defendant in execution, or is applied to his use in discharge of his debt, between whom and the purchaser the law raises a contract in like manner as if the conveyance had been made by him."

In Massey vs. Thompson, 2 Nott & McCord 105, the court said: "The defendant ought not to be permitted to oppose the title of the purchaser. The sheriff's deed is his; he has received the consideration; it has been applied to the payment of his debts; he should be estopped. No more should he be permitted to oppose the recovery of the plaintiff than if he had signed the conveyance with his own hand."

In McKnight vs. Gordon, 13 Richardson's Equity, pages 230 and 240, the court, citing several cases, reaffirms the law as laid down in Massey vs. Thompson.

The officer selling at (the sale under execution) is constituted the agent and attorney of the execution defendant. Rorer on Sales, p. 27.

"And it is well settled that what an owner may sell himself may be sold on execution if there be no law to the contrary." Rorer on Sales, p. 349, § 1083.

Franchises are property. In the case of the West River Bridge Company vs. Dix, 6 Howard, Curtis's Report, vol. 16, page 805, section 541, Justice Woodberry said: "I concur in the views also that such a franchise as the incorporation is a species of property. It is a legal estate vested in the corporation. But it is often property distinct and independent of the other property in land, timber, goods, or choses in action which a corporation like a body, not artificial, may own. It is also property subject to be sold sometimes even on execution, and may be devised or inherited."

This case established the doctrine that a franchise, like any other property, might be taken under the right of

eminent domain, condemned and sold for public use on paying just compensation to the owners.

Daniel, J., in delivering the opinion, said: "A franchise is property and nothing more; it is incorporeal property, and is so defined by Justice Blackstone. It is its character of property only which imparts to it value." And again he says: "We are aware of nothing peculiar to a franchise which can class it higher or render it more sacred than other property."

By the statutes of Florida both these franchises were given in express words to the "assigns" of the corporators, their successors and associates. The power to sell was given; they were made vendable and the subject of mortgage. This is an unusual power and grant of corporate privileges, but it pleased the State of Florida to thus grant and confer those privileges and none can question her authority so to do. The power of this defendant corporation, its privileges and liabilities, are derived from those statutes, and to them must we look for the validity of this sale under execution. The sale of the corporate rights, franchises and property by the marshal is the same as if the deed was voluntarily made for a valuable consideration by the Jacksonville, Pensacola & Mobile Railroad Company, under its corporate seal, to Holland, conveying its realty on the 2d of December, A. D. 1872, (the date of the judgment,) and of its franchises and personalty the date of the execution, to-wit: the 14th of December, A. D. 1872. We contend that from those dates the deed of the marshal to Holland carried title against all intermediate or subsequent liens or alienations.

"When by law the judgment is a lien on the land, the deed on execution sale has relation back to the time of the judgment, so as to avoid against the execution purchaser all intermediate liens and alienations." Rorer on Judicial Sales, § 809, § 786; Bac. Ab. Ex. 725; Black f. 22; 5 Ohio, 48–55; 34 Ill. 440–8.

A purchaser at a sheriff's sale takes precisely the interest which the debtor had in the property sold, subject to all outstanding equities. 6 Wallace, 116, 122.

In James vs. Railroad Company, 6 Wallace, page 753, the Supreme Court of the United States set aside mortgages, declared them invalid, and directed that the judgment creditors be at liberty to enforce their judgments against the railroad companies.

See, also, 15th Florida Reports, page 387, where the Supreme Court held that Holland purchased in that case all the interest of the Jacksonville, Pensacola & Mobile Railroad Company, and was not estopped by the confession of judgment given by the railroad company to the plaintiffs, Jackson & Sharp.

In Cotton vs. Blocker, 6 Florida, page 11, this court sustained the sale of the interest of a mortgagee made by the sheriff, "as if he had assigned the mortgage himself instead of having it sold by the sheriff." The court then said: "Blocker is their assignee and stands in the place of James Tradwell."

In Phillips vs. Hawkins, 1 Florida, page 270, this court held that the interest of a mortgagee may be sold under execution.

In Morgan vs. Mason, 20 Ohio, 401, cited by Rorer on Sales, page 274, it is laid down that "an easement incident to a mill, and to the ground on which the mill is situated, for the supply of water to the mill, is in connection with the mill and premises, a subject of judgment, lien, and of execution sale. The lien of the judgment covers the land and premises, which being the principal thing draws to it all its incidents or appurtenances thereto. They together constitute one whole."

The answer in this case, and the pleadings, show that at the time of the sale, and Holland's purchase, the Jacksonville, Pensacola & Mobile Railroad Company were in the

actual possession of the railroad, operating and, managing it by the officers of the company.

Holland's purchase was subject to outstanding and superior equities, but the equities of prior dignity outstanding, if any there were, are no more disturbed by the sale and deed by the marshal, under execution to Holland, than if the defendant company had for valuable consideration sold and by deed conveyed the said property mentioned in the marshal's deed to Holland; consequently it can be no answer to this power of sale under execution in this case, to say, that thereby equities of prior lien or superior dignity to said judgment and executions in the hands of others are by the sale under execution of the franchise and property of the corporation disturbed.

3d. We have seen that by the laws of Florida execution issued against corporations, and that lands and tenements, goods and chattels, and equities of redemption, were "subject to the payment of debts and liable to be taken in execution and sold," and that even the current money of corporations was also liable to levy and sale under executions.

By what prerogative is or was this defendant corporation exempted from having its lands and tenements, goods and chattels, its equities of redemption, and its current moneys levied upon and sold under execution? It has no such special exemption in the acts by which it was created and acquired the roads either West or East of Quincy; upon the contrary, it was vested with powers by which its "assigns" were vested with all its corporate powers and privileges. It was possessed, as to the road West of Quincy, with the power to "purchase and hold real and personal property, which may be necessary or useful for the purposes of the road; and to sell and convey the same in fee, or for a less estate, or by way of mortgage or otherwise." Section 1, Act 1869. It held even the property it acquired by dona-

tion and for right of way by condemnation, in fee. See section 7.

It acquired by authority of law the roads East of Quincy, owned by the Tallahassee Railroad Company, whose "assigns" were vested with all the corporate privileges granted to the corporators, their successors and associates, who were empowered to "purchase, receive and hold lands and tenements, goods and chattels, of whatsoever character that shall be necessary or useful for the purposes of said railroads, and the same to sell, grant, mortgage or dispose of." Section 1, act 1869, p. 41. And to sell, when they should see fit, rent, lease, farm out or sell any part of the said railroads, to any person or persons, corporation or corporations, excepting to persons or corporations owning any railroads out of the State of Florida. Sec. 4, act 1869, pp. 41-2.

Hence, it held all its real and personal property West and East of Quincy in fee, and could sell and dispose of the same; could convey the property in fee, or otherwise—limited alone as above, not to sell to persons or corporations "owning any railroads out of the State of Florida," and confined, as to the amount and kind of property, to that "which may be necessary or useful for the purposes of the road." It is not pretended that property, which was not "necessary or useful for the purposes of the road," was levied upon or sold under this execution.

2. Under the general laws, "goods and chattels," and "equities of redemption, or the legal right of redemption, in real and personal property, the law said should be subject to levy and sale under executions upon judgments at common law and decrees in equity."

What are goods and chattels? Chattels is a very comprehensive term in our law, and includes every species of property which is not real estate or a freehold. 2 Kent Com., Sec. 342, p. 436; 2 Black. Sec. 386. In ancient times property was divided into lands and tenements, and heredita-

ments on the one hand, and goods and chattels on the other. Williams on Personal Property, p. 1, Sec. 2.

Goods and chattels, says Blackstone, 2 Book, Sec. 386, includes choses in action as well as those in possession. Chattels includes all kinds of property, except the freehold or things which are parcel of it. Bouvier's Institutes, p. 184, Sec. 462.

It also includes money, valuable securities and all other personal property, and even choses in action. Bouvier's Institutes, p. 187, Sec. 470.

3. It is contended that the words lands and tenements, goods and chattels, and equities of redemption, include every species of property of every kind and character that the defendant company could acquire, or was possessed of, or held by it; and we have seen that all this property was liable to levy and sale under execution for the satisfaction of debts, and that the corporations were not exempt from having the corporate property levied upon and sold under *fi. fa.*, but so far from the laws of Florida exempting corporate property from levy and sale under execution, it not only granted the writ as against corporations and their property, but at the time the writ was thus given, to-wit: in 1834, extended the powers of this writ to reach the current moneys of corporations, when the current money of individuals was not liable to execution in Florida; for at that time the writ of execution had no more power than that conferred on it by the laws of England.

Nor is it any answer to the position contended for that, because the lands and tenements, goods and chattels, and equities of redemption, are held or acquired by virtue of a franchise, and for the purpose of a railroad, that the corporation thus endowed by the State with this grant of privileges of franchises can thereby, because possessed of the franchise, hold and retain this property from the reach of a court of common law, and keep it exempted from the power of levy and sale under execution.

Holland v. The State of Florida et al.

In the Bank of the United States vs. Halstead, 10 Wheaton, p. 336, the court said, " an execution is the fruit and end of the suit, and is very aptly called the life of the law; the suit does not terminate with the judgment, and all proceedings on the execution are proceedings in the suit, which are expressly, by act of Congress, put under the regulation and control of the court out of which it issues. It is a power incident to every court from which process issues, when delivered to the proper officer, to enforce upon such officer a compliance with his duty and a due execution of the process according to its command."

We have seen, by the mandate in the execution, the United States Circuit Court in Florida had changed and prescribed the form of the writ, and the power, authority and command of the writ to the property made liable to levy and sale under execution, according to the State laws, and this in accordance with the settled practice of United States Courts, as laid down in 10 Wheaton; 5 Peters, 210; 6 Peters, 648; 9 Peters, 329; 15 Peters, 301; 2 Howard, 608, 301.

What title does the purchaser of an equity of redemption acquire under execution? The equity of redemption is considered to be the real and beneficial estate, tantamount to the fee at law. 4 Kent Com., Sec. 160–1; 1 Hilliard on Real Property, p. 460.

The purchaser of the equity of redemption takes the place of the mortgagor, with all his rights, privileges and disabilities. 4 McCord, 336.

Such a sale is effectual in passing to the purchaser all the rights of the mortgagee. 15 Pick. 32.

The purchaser of an equitable interest takes the property subject to the burden of every prior equity chargeable upon it. 7 Cranch, 34; Howard, 333; 4 Mass. 349; 2 McLean, 268.

A purchaser at a sheriff's sale of an equity of redemption succeeds to the rights of the judgment plaintiff, and may

redeem against a prior incumbrance before foreclosure and sale, although he or the judgment plaintiff may have been a party to the suit for foreclosure. 26 Indiana, 220.

By sale of the equity of redemption the whole property of the debtor is taken from him. 1 Hilliard on Real Property, p. 463.

But not only was the equity of redemption sold and purchased by Holland, but also all the right, title and interest of the Jacksonville, Pensacola, & Mobile Railroad Company in and to its franchise, railroads, depots, warehouses, machinery, and property of every kind, lying and being in the Northern District of Florida. See the answer, levies and deed of the marshal, so that even if there was no equity of redemption sold, the interest of the railroad company, in all its property in the levy described, was sold. But the appellees are trying to force the question that Holland only sold the equities of redemption. That is not true. The record shows that Holland also purchased all the interest of the Jacksonville, Pensacola & Mobile Railroad Company. The words of the levy and deed are the same as if the company had conveyed by deed their interest to Holland.

We contend, therefore, that the foregoing authorities show that Holland acquired by the sale and became the owner of, not only the equity of redemption, but also of all the right, title and interest formerly owned, belonging to and possessed by the Jacksonville, Pensacola & Mobile Railroad Company, in and to its railroad and property of every kind, real and personal, as fully and completely by the deed of the marshal, as if the stockholders, each and every one had, for valuable consideration, sold the same to Holland, and the Directors, President and Secretary, under the corporate seal of the company had, by their order, executed and delivered a deed conveying all of their interest in said property to Holland, and that by said sale the corporate rights, privileges and franchises were, by the terms of the charter, then vested in Holland; he

being the assignee of the stockholders, associates, or successors of the original incorporators.

Having shown that Holland acquired all the right, title and interest of the Jacksonville, Pensacola & Mobile Railroad Company, I now propose to take up the case made by the plaintiffs and the pleadings.

We contend that the demurrer of the answer permits the appellant to attack the complaints, and show that the complaint does not state facts sufficient to constitute a cause of action. Vorhies' Code, p. 236, note e.

The demand of the trustees is that they have a lien of superior dignity to all others for $472,000, and interest being an unpaid balance due for the roads West of Lake City, sold to Dibble and associates by the trustees in 1869.

The answer to this is: 1st. That even if the same was due they cannot recover the same from the Jacksonville, Pensacola & Mobile Railroad Company, because this is especially forbidden by the 15th section of the act of 1869, which prohibited the defendant company from being responsible for the obligations of the old company. This corporation could not assume the debt if due, even if they would. The trustees must look to Dibble and associates, or to the Tallahassee Railroad Company, but they cannot reach the property of the defendant corporation.

2d. The Jacksonville, Pensacola & Mobile Railroad Company was not in existence when this transaction took place, and could not therefore have had notice.

3d. The Legislature in the charter of the Tallahassee Railroad Company ratified and confirmed the sale by the trustees. Act incorporating the Tallahassee Railroad Company.

Therefore, the Jacksonville, Pensacola & Mobile Railroad Company, when it consolidated with the Tallahassee Railroad Company, had the right to presume and believe the same was paid for, and that there was no lien of the trustees

thereon; and therefore stand in the place of innocent purchasers, without notice.

4th. But the facts alleged in the original complaint show that the trustees cannot set up the vendor's lien, because they waived the same by the acceptance of a check of parties other than Dibble and associates, and also by turning their check over to their fiscal agent, Swepson, who receipted to them for the same as cash; this doctrine has been twice laid down by this court. 3 Fla. p. 70–1; 2 Fla. p. 471.

And it will be perceived that the trustees do not aver that the check was then worthless, but that it now is; and they show no steps taken by them from March, 1869, to March, 1872, to recover the same, but wait for three years, when two corporations have been created, and one has acquired this property by consolidation and invested vast sums of money therein, and then propose to take, not only this property that was then sold, but the franchise and all the property of another corporation. Is this equity? What of their laches—what of the equities of judgment creditors —are all these to be set aside on the facts stated in the complaints? Suppose that the trustees had collected this bid in cash and spent the money, could they afterwards recover the property from the Jacksonville, Pensacola & Mobile Railroad Company, or from Holland? Where is the difference between cash, and a check, and a receipt of their own agent, either of which they could have converted into cash?

### The Claim of the State of Florida.

The State of Florida claims to have a lien of superior dignity to all others, by virtue of being the holder of three millions of bonds, said to be issued by the Jacksonville, Pensacola & Mobile Railroad Company, and for which the Governor of the State issued and delivered to the President of said railroad company a like number of bonds of the State of Florida, under the act of 1870.

By virtue of this demand this plaintiff prays for judg-

Holland v. The State of Florida et al.

ment for the interest said to be due thereon from the 1st January, A. D. 1870, and seeks to obtain a decree against Holland perpetually restraining him from intermeddling with such possession, and that he may be compelled to account for the income of said property in his possession.

To this Holland answers that the State never gave any consideration for said railroad bonds; that the said pretended State bonds are null and void, because issued in violation of the constitution of the State of Florida; that the State has no legal or equitable lien on said property, and acquired no right or interest in the bonds alleged to have been issued by said company, and that said railroads have no lien or charge whatever on said railroad, or the property purchased by Holland.

The demurrer to Holland's answer, we hold, places the case in the position that it would be if the cause was set down for hearing on bill and answer. The rule then is, "where the case is heard upon bill and answer, every matter set up in the answer, whether responsive to the bill or of pure avoidance, must be taken as true; and this is the rule even where the defendant avers that he believes and hopes to be able to prove such facts." 1 Hoffman's Ch. Pr. p. 495.

The demurrer opens all the works of this plaintiff to attack. If then, they can recover in any particular, they must show that the State bonds were exchanged for railroad bonds, which have a lien superior to Holland's judgment, execution, sale and conveyance by the marshal.

1st. We hold that the Governor is not authorized to speak for and in the name of the State in this case; that there is no statute or warrant of law which authorizes him to bring this proceeding or set up this claim; that the Governor can not, by pleading or otherwise, bind the State and fasten on her people obligations for millions of dollars without statutory authority commanding him so to do. And that in this case the rule should be enforced by this court, when here is

a case presented where the Governor, by private counsel, and against the views and opinions of the Attorney-General of the State, as shown by the journals and records, denies that the State has ever issued a single State bond, or is liable for any such obligation, or has any such rights as is claimed in her name by the Governor and his private counsel; and we hold that there is no law of Florida that warrants the use of the name of the State, or the employment of private counsel, and the passing by of the Attorney-General, as is done in this case by the present Governor and his solicitor, by which this attempt is made to fasten•on the people of Florida millions of dollars of debt claimed to be obligations by the State, under the pretext that this suit is brought for the purpose of enforcing a lien of the State in bonds to which the State never claimed to have any interest. See Treasurer's Report, appendix laws of 1874–5, and Journals of the last Legislature of Florida, p. —

And so far from the State of Florida ever acknowledging the claim or obligation in this bill, set out and by virtue of whose superior equities this present Governor and his solicitor propose to take all this property; that the Legislature of Florida impeached the Governor who issued and delivered these bonds for so doing, "with full intent to violate the constitution of the State, and especially the said act of 1870." See Journal of Assembly, A. D. 1872, pp. 258, 259, Articles 3 and 4; Senate Journal, Extra Session, 1872, pp. 36, 37, 38.

So here we have the spectacle presented of the people of Florida, by their representatives, impeaching the Governor who issued these bonds, for so doing with intent to violate the constitution and the act of 1870, and the present Governor, Stearns, employing private counsel and using the name of the State of Florida to fasten on the people this enormous debt, under the pretext that they are protecting the State by assuming an obligation which the State never recognized. The State can have no claim on this property

unless the bonds issued by her were valid. The power to issue the bonds is claimed to exist in the words "and perfecting public works." Sec. 7, Art. XII.

The constitutional provisions are as follows:

### ARTICLE XII.—TAXATION AND FINANCE.

"Sec. 6. The Legislature may also provide for levying a special capitation tax and tax on licenses; but the capitation tax shall not exceed one dollar per annum for all purposes, either for State, county, or municipal taxes."

"Sec. 7. The Legislature shall have power to provide for issuing State bonds, bearing interest, for securing the debt [of the State] and for the erection of State buildings, support of State institutions, and *perfecting* [must be State] *public works.*"

"Sec. 8. No tax shall be levied upon persons for the benefit of any chartered company of this State, or for paying the interest on any bonds issued by said chartered companies, or by counties or by corporations, for the above mentioned purposes."

In every court where this question has come up the plaintiffs, by their private counsel, have argued that the Supreme Court of Florida has decided that these bonds were issued in accordance with constitutional authority. This we deny. All that the Judges decided was that the Legislature could issue bonds to complete the line of railway designated in the internal improvement act of 1855. But this road is not that line of railway, but an entirely new line, having its terminus at Mobile, Ala., while the line of 1865 commenced and terminated in Florida; and in addition to the line of the Jacksonville, Pensacola & Mobile Railroad Company, the new corporations were authorized to build and operate the line of 1855. See the charters where the powers of the Florida, Atlantic & Gulf Central Railroad Company was given to the Jacksonville, Pensacola & Mobile Railroad Company in the first section of the act of 1869, and the

powers, privileges, franchises, &c., of the Pensacola & Georgia Railroad Company was given to the Tallahassee Railroad Company. These powers were decided by this court, in 10 Florida, page 145, that both these companies had a common right to build the line of road of 1855, hence the Jacksonville, Pensacola & Mobile Railroad Company had the power to build and operate two lines of railway, the first being the road to Mobile, designated in the first section of the act of 1870.

2d. That part of the line of railway laid down in the act of 1855, which was unfinished. It was to this last line of road the Judges said the State might issue bonds to perfect or complete that line of railway. But they never said that State bonds could be issued to build a railroad to Mobile from Quincy, which, when built, was to be the property of a corporation in fee, and which could at any time be sold by the company in fee.

The Supreme Court of the United States, at its last term, the greatest Chancellor on that bench, Mr. Justice Miller, delivered the opinion in the case of the City of Topeka, Central Law Journal, page 156, said: "The validity of a contract which can only be fulfilled by a resort to taxation depends on the power to levy a tax for that purpose."

Our Constitution in Sec. 3, Article XII, provides: "No tax shall be levied upon persons for the benefit of any chartered company of this State, or for paying the interest on any bonds issued by said chartered companies, or by counties or by corporations, for the above mentioned purposes."

If, then, State bonds can be issued to build a railroad, the road thus built by the obligation of the State, to be paid for by taxes levied on her people, must, we hold, when built and complete, *be the property of the State and her people*, and not the absolute property of any corporation who hold it in fee and may sell it at any time in fee. It is a monstrous doctrine that the Legislature can, *ad libitum*, issue bonds and tax the people to build a railroad to Mobile for the

Holland v. The State of Florida et al.

Jacksonville, Pensacola & Mobile Railroad Company, which, although designed to be built by the taxes collected from the people at large, is to become the absolute property of that corporation. And yet the legal monstrosity has been in the Circuit and Supreme Courts of the United States claimed to have been decided by this court, and is now here again sought to be established by your honors.

Again ? Where in the constitution can authority be found that will authorize State bonds to be issued to be exchanged for railroad bonds? This *swapping* of State obligations for railroad paper at the will of the Legislature, *ad libitum*, is certainly a new idea, begotten by those who believe that the Legislature are the dispensors of all power, and that it only requires a sufficient number of legislative votes to do anything. But this court will guard the constitution from such pernicious construction.

This court—that instrument created to guard the rights of the people from legislators, corporations, and even judges—and to this court we confidently look to re-echo the great principles laid down in the Topeka case, to-wit: "That there are rights in every free government beyond the control of the State, and that the theory of our governments, State and National, is opposed to the deposit of unlimited power anywhere. The executive, the legislative, and the judicial branches of these governments are all limited and defined powers." Such is the language of Mr. Justice Miller, and grander words never fell from a bench, nor did jurist ever deserve a people's homage more than does that great Judge, for turning the gage of authority back to the land marks that our fathers have set, and telling them from the Supreme Court of the United States, thus far shall thou go and no farther.

We further hold, that the language of the act of 1870 clearly provides that the only statutory bonds that can be issued under this act, that are to have a statutory lien on the road, has reference solely and exclusively to the road west of

Quincy, designable in the first section of the act of 1870. It is not pretended that any mortgage was ever given to the State, yet the bonds to be given on the one hundred miles east of Quincy, provided for in the 4th section of the act, clearly apply only to State bonds to be given in exchange for railroad bonds, secured by a first mortgage, and not by the statutory lien provided on the road west of Quincy.

Again, we ask, if all this is wrong where is the authority to issue State bonds, not only to complete the road but "in order to aid the said Jacksonville, Pensacola & Mobile Railroad Company to complete, equip, and maintain its road?" See Sec. 2, Act 1870.

So that the Legislature may issue bonds to complete, to equip it, and after it is completed and equipped then issue more bonds to maintain it, or in other words to operate it.

So that all the railroad company required was votes enough of a Legislature, and then the bonds of the State might be issued to build and equip a road for them to own in fee; and after it was built and equipped they could get more bonds to operate, maintain or run it. A very nice arrangement, that, for the corporation. But how about the rights of the people who are to be taxed to pay the obligations thus issued "in order to aid" the Jacksonville, Pensacola & Mobile Railroad Company? If ever a constitution was treated as a nullity it was when such doctrine as this was attempted to be fastened on a people by an Executive charged with guarding that constitution.

Again, this act of 1870, and the original acts, clearly show that no exchange of bonds was to issue except for each mile to which the railroad company had a clear and perfect title. Yet the Legislature in the charter of the Tallahassee Railroad Company, in the 6th section, provided for a lien of superior dignity to all others for the instruments, whether bond, mortgage or otherwise, given on these roads by Dibble and associates, for more than a year prior to the act of 1870. No mortgage could then be given by the

Jacksonville, Pensacola & Mobile Railroad Company, or this road acquired by consolidation, of equal dignity to this, by the act of 1869 created. Nor could the Legislature of 1870 disturb that lien without violating the constitution of the United States. Hence, no first mortgage could be given to the State on the road east of Quincy, formerly owned by the Tallahassee Railroad Company.

Now, we ask, is this court to sever the bonds, if any issued in accordance with the requirements of the constitution, from those issued in violatian of that instrument? The Almighty waits for the day of the arraignment of all, and the termination of all sublunary things, before even He will undertake to separate "the sheep from the goats."

But it is said that Holland cannot raise this question. Why? Because our sovereign lord, the King, that is to say the present Governor and his private counsel, have seen fit to claim and allege that they, in the name of the State and for the State, are seeking to establish what they call a lien on this property that Holland bought, of superior dignity to all others. Holland bought all the right, title, and interest of the defendant company in this property, and no particle of property can be taken from him unless by one having in court shown a superior title thereto. The constitution of the United States, though lately, and frequently amended, and by one of those amendments emancipated the blacks, has not yet been so changed as to enslave the whites. One of the rights of a free man in this land is to hold, enjoy, and possess property without let or hindrance, even by the Governor of Florida, until dispossessed by judgment of a court rendered in favor of one having superior title, not of one *ascertaining* such superiority.

The State of Florida professed in the act of 1870 to aid this company. That company consisted, 1st, of the incorporators and their associates; 2d, of their successors, if any; and lastly, of their assigns.

How, then, is *this aid* to be given? By taking the prop-

erty for the satisfaction of bonds issued in violation of the constitution. In other words, to get the property for nothing.

The Supreme Court of the United States, in Aspinwall vs. Davies Co., 22 Howard, 364, says: "That the subscription was made and the bonds issued in violation of the constitution of Indiana, and therefore without authority, and void." Yet, nevertheless, here is the property of the citizens attempted to be taken from them on a claim set up on bonds that issued in violation of the constitution, and are void. 10 Wall., 683.

Judge Bradley, in the great opinion rendered by him in Montgomery, Ala., said: "Public officers cannot acquire authority by saying they have it." They cannot thus shut the mouth of the public whom they represent, yet here this public functionary seeks to shut Holland's mouth by keeping him from denying the constitutionality of those bonds, because forsooth his Excellency wants this railroad, for what? not for the State, because the State, whenever it has spoken by voice other than his, has denied the validity of these bonds.

Again, the record shows that when the plaintiffs took all the property and assets of the company in March, 1872, by their own averments, the interest on the State bonds was paid and provided for until the following July, 1873, and the net income of the corporation was over $100,000 a year, and the State that proposed to aid the corporation, by seizing the property, as this court has decided, illegally, brought the company to ruin and forced the indulgent creditor, Holland, in self-defence, to levy and sale. The equity of the State is like that of pirates, who having run a fine ship ashore, go into admiralty, and pray a sale of ship and cargo for salvage.

The answer alleges that the railroad company paid the State coupons due before the commencement of this suit, and we hold that in equity pays the railroad coupons, and hence the State cannot collect interest on the railroad bonds.

when the interest on the State bonds was paid by the defendant company.

The law required the Governor to designate a place in the city of New York where the bonds of the State and interest were to be paid by the company. See Sec. 10, Act 1869, and Sec. 2, Act 1870, p. 11. The answer avers no such place was ever designated, and that there can be no default.

These railroad bonds are not single bills nor commercial paper; they are not payable *alone in money*, but may be paid to the State in any State paper or indebtedness, even before maturity; they are payable to the State alone, and are not assignable.

The Act of 1869, Sec. 13, is as follows:

"Sec. 13. The said Jacksonville, Pensacola & Mobile Railroad Company may, at any time before maturity of its bonds, discharge its debt to the State, or any part thereof, by payment in national currency or in bonds of the State; *Provided*, That this shall not be construed to include indebtedness incurred in aid of the rebellion."

This is the statutory contract, and no court or legislature can change it; and, like all contracts, we have a right to require its enforcement, and to it we must look, and not to the law merchant as to negotiable paper, bills of exchange, or promissory notes.

But we have shown that the State bonds, so called, are utterly worthless, and that the State gave no consideration for the railroad bonds, hence the claim of the State cannot be enforced. 1 Story on Contracts, Sec. 427, pp. 526–7. The law requires not only a consideration but that it should be valuable. Ib., Sec. 429.

Whoever takes a bond must see that there was authority to issue it—even an innocent holder for value is thus bound. 6 Wall., 683.

Again, we hold that the construction to be given to these statutes, or to the contracts thereunder, do not depend on

that which the parties themselves have put upon it. 10 Wall., 367.

Again, the certificate under oath by the President was a prerequisite to any State bond being delivered. The answer denies that any such oath or certificate was ever made, hence no bond could issue. Sec. 2, Act 1870.

Holland's answer in the Supreme Court of the United States was made a part of this supplemental complaint by the plaintiffs, and therefore we hold its averments and the averments of the plaintiffs, and show that no judgment should be rendered for them for that; they have thus stated themselves out of court; they have made his answer a part of their own complaint.

The answer denies that the railroad company ever was indebted to the State of Florida, and denies all fraud, &c.

We hold, that as Holland is responsible for all equities superior to his judgment lien, that he has the right to question and require proof in a competent court, of any demand or claim, by any one who avers a superior legal or equitable right to him before this property can be taken from him, or sold by any one, State or otherwise.

The record shows that Holland, after his purchase, and before any suit was brought against him in any court, offered to sell and convey this whole property to the plaintiffs upon being paid his judgment; therefore, we hold, that the court below erred in sustaining the demurrer to Holland's answer, and that we have shown that the plaintiffs, in their complaints, have not stated facts sufficient to constitute a cause of action.

*H. Bisbee, Jr.*, for appellees.

The State and Trustees of the Internal Improvement Fund commenced a suit for relief March 20, 1872, against the Jacksonville, Pensacola & Mobile Railroad Company *et al.*, and a receiver was appointed over the entire railroad west of Jacksonville.

June 22, 1872, an amended complaint was filed by the plaintiffs, wherein the plaintiffs, the trustees, set up a demand against the said company and its property for $472,000 due, as a part of the purchase money arising from the sale of the railroad west of Lake City, March 20, 1869.

The State, in said amended complaint, avers that it is the holder of three thousand bonds issued by the said company; that said bonds are a lien upon all of said railroad west of Lake City; that a large sum of interest was then due, and that the Governor's right, under the statute of January 28, 1870, to seize and sell the road, had accrued.

On April 2, 1874, the court below rendered a decree in favor of the trustees for the balance of the purchase money aforesaid, against said company, from which said company has not appealed. Defendant Holland appealed, and said decree was reversed as to him, on the ground that he had never had his day in court to make his defense, if he had any, against such demand.

But this decree, or the rights of the trustees against Holland, are not now before the court on this appeal, the foregoing proceedings being stated as a brief history of the case.

On March 24, 1874, the plaintiffs filed a supplemental complaint, alleging that the possession of the receiver had been disturbed, and, *inter alia*, that the defendant Holland, at the December Term of the United States Court, 1872, recovered a judgment against the said company for the sum of about $60,000; that execution at law issued thereon; that the marshal levied such execution upon the equities of redemption of said company on all its property located west of Lake City; and upon such levy, said property so levied on, was sold on the first Monday in May, A. D. 1874, and defendant Holland became the purchaser, his bid being credited upon the execution. And that on or about the 7th of July, Holland, under such purchase, acquired the possession of said railroad property, and received the rents and tolls thereof.

The supplemental complaint further alleges that a large sum of money is due the State on amount of interest due, and that the defendant Holland is insolvent, and prays for a decree for the balance of said purchase money, and for the interest due the State ; also a prayer for general relief, and that defendant Holland may be perpetually enjoined from interfering with the property or asserting any right hostile to the rights of the State or the holders of said bonds.

On the — day of May, 1875, Holland filed his answer to the supplemental complaint, admitting that he purchased the railroad, as alleged in said complaint, under an execution sale, and does not deny the allegations by the plaintiff that he is insolvent, and, therefore, by force of Section 118 of the Code, he admits such allegations of insolvency to be true.

Defendant Holland sets up in his answer that the State bonds delivered by the State to the Jacksonville, Pensacola & Mobile Railroad Company, as the consideration of the bonds of that company, held by the State, are unconstitutional, and, therefore, that the State has no lien upon the property.

Holland further avers and claims in his answer that as the purchaser, under said execution in his favor, he becomes and is the absolute owner of said railroad; and that his title is paramount to any interest the State has in the property.

Holland has in his answer a vague allegation that no interest was due on the bonds of the Company held by the State, but does not aver that no interest was due when the amended complaint of June 22, 1872, was filed, nor when the supplemental complaint of March 24, 1874, was filed.

Holland further avers that the State court receives interest due on said railroad bonds, because the State never designated the place in New York where the coupons should be payable.

The material parts of Holland's answer is included in what has been above stated, and to this answer the State (not the trustees) filed a general demurrer.

The court below sustained the demurrer, and from the order sustaining the demurrer the defendant prosecutes this appeal.

## Argument.

The question in the case is, what are the relative rights of the parties, the State, and defendant Holland?

The defendant's answer admits that the State is the holder of three millions bonds of said company, but denies they are a lien on its property, while the plaintiff insists that said bonds are a lien, and that whatever the defendant took by the sale under the *fi. fa.* is burthened with this lien.

1. The State further insists that neither the railroad property nor the franchises could be sold on a *fi. fa.*, and that Holland has no right to receive the income of the road nor to control the possession of it.

2. That if by his purchase Holland acquired the fee, or any interest in the real estate appurtenant to the road and necessary to the use and value of the franchise, he cannot possess himself of such real estate, nor disconnect it from the franchise to be a corporation, and receive tolls either by a conveyance or otherwise, and that he took the same, whatever in law or equity it may be, subject to the State lien.

3. The State contends that the levy, as shown by the return on the writ of execution, was void, because the officers proceeded to levy upon what could not be, as well as what *possibly* could be sold on a *fi. fa.*, and thus intermingling the two, rendered it a nullity, and may be so decided, when it is brought collaterally before the State court.

The complaint of June 22, 1872, avers that said company is insolvent, and specifies certain judgments recovered against it, and alleges that the road west of Quincy had then been sold under an execution. The answer of the Jacksonville, Pensacola & Mobile Railroad Company does not deny the allegation of insolvency and the recovery of said judgments. The judgment in favor of Holland and sale to him, would seem to preclude any doubt as to its insolvency. This

being so, if it be held that the State has a lien to secure said company bonds, they being more in amount than the value of the property, no matter·what title he took.

### State Lien.

Defendant contends that the State has no lien, upon two grounds :

1. That State bonds delivered for railroad bonds are unconstitutional and void, and, therefore, were not a good consideration for the railroad bonds.

2. That if the State bonds are constitutional, the acts of June 24, 1869, and January 28, 1870, did not authorize an exchange of bonds on the road east of Quincy.

### Constitutionality of State Bonds.

Appellee submits and insists that this question is not in this case, *and cannot be raised by the appellant.*

It is too clear for argument that the Jacksonville, Pensacola & Mobile Railroad Company having received the State bonds and sold them, as it admits in its answer, and the deed of trust to Chase *et al.*, an exhibit to the supplemental complaint cannot be heard to say that the State bonds are unconstitutional, as a defense to suit, to force the payment of its bonds.

Having received and sold the State bonds, the company is estopped from setting up a defense and from raising the question of the validity of the State bonds.

This is a general principle.

The State bonds are the consideration paid by the State for the railroad bonds, and the latter being covenants under seal, the consideration cannot be inquired into by the obligor. The company does not attempt this, but admits that the State has a lien, both in its answer *and deed of trust, made long before Holland acquired his interest,* which deed was made an exhibit to the complaint filed June 22, 1872, when Holland represented the company as its attorney in this case, and of course Holland had full notice of the issuing of the

bonds, and that the State had a lien upon the road to secure their payments.

Holland, as the purchaser at the execution sale, stands in the shoes of the company, (assuming that there are no objections to the sale,) and is estopped from setting any defense which the company is estopped from *setting up*. Whatever estops a "judgment debtor, estops a purchaser at a judicial sale under such judgment." Her. on Est., Secs. 216, 239; 35 Penn., 525; Richards vs. Johnson, 4 Hurls & N., 660, and other cases there cited.

"Any person claiming under one who is bound by an estoppel, is himself bound by the same estoppel;" Id., Sec. 216; Phelps vs. Blount, 2 Dev., 177; Douglas vs. Scott, 5 Ohio, 199; Work vs. Willard, 13 N. H., 389; Maple vs. Russort, 53 Penn., 351.

"No man shall be allowed to dispute his own deed, for it is not only conclusive upon the party executing it as to the very point intended to be effected by the instrument, but also as to the facts recited in it." Hermann on Estoppel, Sec 211, last part on page 232; Id., Sec. 212.

Now, the bonds of the company (a copy of one of which is filed in the court below and should be in the record) recites that they are executed in accordance with the provisions of the acts of the Legislature authorizing this issue. These acts of the Legislature making them a first lien, constitute a part of the contract, consequently, neither the company nor Holland, who claims under the company, can deny the lien.

Holland is a privy in estate of the company, besides:

"A purchaser at a judicial sale can only take the interest the debtor had, subject to all outstanding equities." Osterman vs. Baldwin, 6 Wallace, 116.

Again, "A purchaser of an equity of redemption cannot deny the validity of the mortgage on the same estate, and then hold the entire estate." Russell vs. Dudly, 3 Met., p. 149, (1841.)

"The purchaser of an equity of redemption can aver no title against any other person than the execution debtor, his. tenants, and assigns. Foster vs. Mellon, 10 Mass., 421.

"The assignee of an equity of redemption cannot allege usury in the loan to the mortgagor to defeat a foreclosure by the mortgagee." DeWolfe vs. J. Johnson, *et al.*, 10 Wheaton, 367; Adams vs. Barnes, 17 Mass., 365.

The case cited (*supra*) in 10 Wheaton, would seem to be decisive of this question.

To have shown usury, would have rendered the *mortgage void,* as made in violation of law. The assignee of the equity of redemption was estopped from averring it.

Holland is in no better position than he would be had the company assigned all its interest to him, and if in one case he cannot show the State's mortgage void, he cannot in the other.

The ground of this doctrine is that it would *be a fraud* to levy upon an equity of redemption, thus acknowledging the mortgage and deterring purchasers and bidders at the sale, buying the property for a song, and then claim the entire estate.

It is true, Holland claims that the levy was upon all the property, right, title and interest of the company, something more than the equity of redemption; but this cannot avail him, *having admitted the existence of a mortgage by his levy.* The words, "property, right, title and interest of the company," would be taken by the public, as it was by the courts, as merely descriptive of the thing purchased; that is, the right, title and interest subject to the lien of the mortgage, otherwise it would be a clearly fraudulent act; and everything done for the purpose of keeping away bidders or preventing the property bringing its full value, is a fraud, and vitiates the sale.

But this is not all: If such an equity of redemption could be sold at all it could only be sold after *an appraise-*

Holland v. The State of Florida et al.

*ment of the value of the equity of redemption as required by the statute.* Thompson's Digest, p. 355.

This was not done. See Marshal's return and answer.

"Execution *cannot be levied* upon an equity of redemption except in the manner provided by the statute." Warren vs. Childs, 11 Mass. 222; 12 Cush. 344.

"Compliance with the statute should be shown by a return of the Marshal on the writ," *but it is not.* Welsh vs. Joy, 13 Pick., 474.

At common law an equity of redemption could not be sold on a *fi. fa.* Smith vs. McCann, 24 How., 398.

It follows that the statute authorizing the sale of an equity of redemption must be strictly complied with, otherwise no title passes; and this is the same both in the State and Federal Courts.

"A sale by the marshal not conforming to the State practice is *irregular and void, and conveys no title.*" Smith vs. Cockrill, 6 Wall., 756; Moncure vs. Zuntz, 11 Wall., 416. These cases are directly in point.

But we go farther, and insist that this statute authorizing an equity to be sold does not apply to corporations because the State has legislated and specially provided *what writs* may be issued against a corporation, and upon what property such writs may be levied on, that is *goods and chattels and current money of the corporation.* Here is a limitation as to *the kind of property* subject to levy on a *fi. fa.* vs. a corporation. *When this class of property cannot be found* sufficient to satisfy the execution, then the remedy of the creditor is by sequestration of the corporate property, through a receiver, to apply the income of the corporation till the debt is paid, as provided by the Act of February 17th, 1872. Chapter, 1870. See Rorer on Judicial Sale, chapter 14.

Where this subject is fully discussed, and authorities cited to show that *sequestration is the proper remedy, and that a franchise cannot be sold on execution at law.* This is wan-

dering a little from the point, which is, that Holland can-
not raise the question of *the validity of the State mortgage*
by averring illegality of the State bonds, or otherwise. The
State bonds are not in question. in this suit. No party to
this suit is seeking to enforce payment of the State bonds.
To agitate the question can serve no good purpose. The
State, by delivery of the bonds, is indemnified sufficiently to
sustain the promise and covenant of the company, contained
in its bonds, even if the considerations could be inquired
into. An appellate court never decides any question of law,
not necessary to be decided, in disposing of the case before it.

## *Lien of Company Bonds.*

Assuming, then, that the constitutionality of the State
bonds cannot be raised nor decided in this case, to what
extent has the State a lien to secure payment of the Rail-
road bonds? Defendant pretends that the statutory lien
does not extend to any of the road east of Quincy ; that the
lien *does* extend to the road east of Quincy, is easily demon-.
strated.

Section 2, Act of January 28th, 1870, Laws of Florida,
chapter 1731, authorized the Governor to exchange bonds
with the company for the whole line of road owned by, or
belonging to, said Jacksonville, Pensacola & Mobile Rail-
road Company.

The pleadings admit that that company owned the road
west of Lake City, and *acquired* it between that point and
Quincy and the St. Marks branch, by consolidation of the
Tallahassee Railroad Company.

The 3d section of said act provides "that *the State* shall
have a lien which shall be valid to all intents and purposes
as a first mortgage, duly registered upon the part of the road
for which the State bonds were delivered, and on all the
property of the company, real and personal, appertaining to
that part of *the line which it may now have*, or may here-
after acquire, together with *all the rights, franchises, &c.*,

thereto belonging." This language is clear and explicit, and includes all present and thereafter acquired property.

Where the language of the mortgage was, "all present and future to be acquired property," it was held by the Supreme Court of the United States that the lien attached to all property subsequently acquired, to the exclusion of second mortgages and judgment creditors. Pennock vs. Coe, Trustee, &c., 23 How., 117.

The same principle rigorously applied in the following cases:

Dunham vs. the Cincinnati Railroad Company, 1 Wall., 254; Galveston Railroad vs. Cowdray, 11 Wall., 459; Sidney Dillon vs. Barnard, Supreme Court United States, decided last term, not yet reported. 2d vol. Red. on Railways, 4th ed., pp. 468–90; 2d Seldon, R. 179; 3d Green, Ch. R. 377; 32 N. H. R. 484; 2d Story R. 630; 25 Barb. 286.

In the light of the principle established by these authorities the lien attaches to property acquired by the company after the exchange of bonds, and even had the company not owned the road east of Quincy when the bonds were exchanged, this lien attaches to it in full force the moment it was acquired to the exclusion of judgment of creditors.

Indeed, if not a statutory lien the bonds would be treated as a mortgage by a court of equity, and enforced accordingly, where bonds were issued by a canal company, declaring on their face, in effect, that they were a mortgage bond, *though not in words*. Where there was no lien by the statute nor by a mortgage, the Supreme Court of the United States held, "that such bonds will be treated by a court of equity as a mortgage, and enforced according to the intention of the contracting parties." The Water Valley Canal Company vs. Vallette *et. al.*, 21 How. 414.

On such a lien the appointment of a receiver was sustained. Id.

The same principle was enforced in the following cases:

King vs. Tuscumbia C. & D. Railroad Company, 7 Penn. L. J. 166; 12 Price, 197; 8 Price, 697; 25 Barb. 286.

In the case of the Water Valley Canal Company, 21 How. 414, it was contended that the bonds not being secured by any mortgage, placed the holder in no better position than a creditor holding an unsecured demand. The court held the contrary, and sustained the lien of the bonds.

Now, the bonds held by the State recite that they are issued in accordance with the acts of the Legislature. Those acts provide for and specify first mortgage bonds; hence the company contracted for and intended to give first mortgage bonds. The acts of the Legislature relating to the character of the bonds are as much a part thereof as if the language of the acts were duly set forth therein; therefore, supplying the principle of the authorities last cited, they must be treated as a mortgage bond, and so enforced. Besides, the doctrine of estoppel will not permit Holland to question the lien.

The conclusion is, that the State is entitled to the same remedies ordinarily granted to a person holding a first mortgage railroad bond, and to a decree for interest unpaid, and a decree for sale if asked for; and that Holland must be enjoined at least from asserting any rights hostile to the rights and remedies of the State, or the holder of the railroad bonds, and be adjudged to hold what he has, if anything, in subordination to the rights of the State.

And in this view of the State's case, Holland's answer constitutes no defense to the action. The question as to the amount of interest due is a matter to be determined before the referee or master.

But we go further, and contend that defendant should be enjoined from receiving tolls and interfering with the possession of the road in any manner, because the franchise cannot be sold on execution at law. A corporate franchise cannot be sold on an execution at law, unless the Legisla-

ture of the State has specially so provided by statute to be sold. 24 Howard, 257; 21 Howard, 125.

Nor can the real estate attached to the franchise and necessary for its use and to its value. 24 How. 257; Rorer on Judicial sale, ch. 14; 2 Redfield on Railways, Sec. 235, ch. 33, pp. 465–6; Note W. pp. 544–5; 5 Iredell, N. C., 297, 305; 4 Hump. 488; 13 Sergt. & Rawle, 210; 9 Nott & Sergt. 27.

When real estate can be levied upon: If real estate be joined in one levy with the road, the whole levy is void. 2 Red. p. 545; Note 2, 13 Sergt. & R. 210.

Reason of this rule is, that a franchise is conferred by the sovereign power upon certain persons because of special confidences reposed in their integrity and ability to accom-plish the object in view, and thus benefit the public; and public policy forbids a sale on execution of such franchise and the property with which it is connected, and thus to separate the structure into divers parts, in the hands of in-dividuals. It is a trust delegated by the State to a political person, and cannot be delegated to any other person with-out specific legislative authority. 2 Red. Sec. 335, pp. 465–6. Note.

Defendant concedes this to be a well settled general rule, but avers that the franchise in question is taken out of the rule by force of the word "assigns" in the first section of the act of June 24, 1869. He contends that by reason of the word assigns, the company could convey by deed its franchise, and that whatever it could convey by deed can be sold on execution at law. As a general principle this may be so, but there are exceptions, and this is one. At common law, an equity of redemption could not be sold on execu-tion, but certainly the owner of it could sell it by contract, by deed of release, &c.

But the language of said section is not that the company may assign its franchise, but that Swepson and others, their "assigns," are hereby constituted a body politic and corpo-

rate, &c., and there is nothing to warrant the conclusion that the Legislature intended to authorize the company to sell its franchises.

It is incredible that such an intent could have existed. It is against the entire policy of the State, as shown by its previous history and legislation.

Whenever the Trustees have sold a railroad under the act of 1855, even under a mortgage of the franchise, the purchasers have always applied to the Legislature for an enabling act. This has been the course, in like cases, in other States.

Section 3d., act of January 28, 1870, reserves in the Legislature the power of approving any sale made by the Governor to foreclose the State's lien. The court will not recognize anything less than express and clear language of an act of the Legislature to that effect, as authorizing the sale of a franchise on a *fi. fa.* 21 How. 125; 24 How. 257.

Besides, the power given by the Legislature to assign corporate property, does not pass the franchise by such an assignment. 2 Red. 553, Sec. 4; 21 Barb. 221; 3 Comst. 338.

There is no act of the Legislature of this State authorizing the sale of a corporate franchise on an execution at law, and it is impossible that the road-bed, depots, workshops, can be sold and severed from the structure, and thus destroy the work and the value of the franchise.

Defendant contends that the franchise is a chattel, within the meaning of the language of the act of 1834, (Thomp. Dig. 354,) authorizing goods and chattels to be sold on execution. But, being used in the statute in connection with the word goods, it is plain that the word chattels was used in its ordinary sense in such connection.

Holland sets up in his answer, that the State bonds are illegal, because, as he alleges, the President of the company did not certify under oath, as required by law, as to the length of the road. The language of this averment is such as to leave it in doubt whether defendant intended to aver

that no certificate was made at all, or that it was made, but not as it should have been made.

But here, again, the doctrine of estoppel precludes the company, and therefore the defendant, from raising the question; and, " where a corporation is authorized by law to issue bonds, having issued bonds reciting facts showing regularity upon their face in a suit thereon, the corporation is estopped from denying that they were issued conformably to the statute." 2 Black. 722; 1 Wallace, 83, 291, 384; 5 Wallace, 772.

" The only defense open by a corporation in a suit by a holder of its bonds, is the *want of power* to issue the bonds. If power to issue existed, non-compliance with the statute authorizing the issue, will not defeat an action by an innocent holder for the value." 21 How. 539; 14 Wall. 282; 13 Wall. 297, (1871).

In the case last cited, it was held that even where a certain portion of the citizens were required to vote for the issue of bonds, a *bona fide* holder for value will recover, though no vote was taken.

The law requiring the certificate was the mode of furnishing the Governor the number of miles of road completed and in running order before the exchange was made. It does not go to the power to issue. The bond is merely directory—is not of the essence of the thing to be done, and any other mode would have answered the purpose.

Gabriskie vs. C. & O. Railroad Company, 23 How. 381, is a strong case to illustrate the doctrine that a corporation cannot defeat an action upon its bonds by averring non-compliance with the statute in their issue.

The 5th subdivision of the answers avers, that the Governor never designated the place in New York as provided by the statute where the interest on company bonds should be paid, and the company cannot be in default until such place is designated.

If Holland has succeeded to the place of the company,

and standing in its shoes, and liable to pay the interest on the company bonds, he can raise this question; but if it be held that by his purchase he did not acquire that position, and is not entitled to the possession of the property, he cannot raise the question. But this averment made by Holland, or the company, even if true, is not a defense to the action for a decree adjudging the lien of the State to be valid, and declaring the rights of the parties.

Nor is it any defense to a decree for interest which has actually accrued. This provision of the statute was simply to provide a place where it would be convenient to make payment; it does not constitute a part of the obligation of the bond or coupons; it is not a necessary part of the obligation, and these coupons are within the rule of law laid down as follows: "The time and place of payment in a promissory note or bill of exchange are not of the essence of the contract, and no averment (at law) of presentment at the time and place is necessary in an action against the maker or acceptor. If the defendants claim that they were ready at the time and place designated to pay the obligation, they must allege and prove it; and it will avail them only to the extent of preventing the accruing of interest, but does not discharge nor bar the action. Edwards on Bills and Notes, 479, 481; 17 Johns. 248; 1 Peters, 604; 11 Wheaton, 171; 3 Richardson, 311; 8 Cowen, 271.

But this is not alleged in the answer, and consequently nothing is alleged to prevent the accruing of interest upon the coupons after they become due.

In subdivision 6 of the answer, there is a vague and argumentative averment that the interest was paid up to the time when suit was commenced. Suit was commenced against the company March 20, 1872, wherein no demand for interest was specially set up, but the amended complaint of June 22, 1872, does not set up such demand and state the amount of interest due then. The supplemental com-

plaint of March 24, 1874, which is the commencement vs. Holland, avers that no interest has been paid since the suit was commenced, and states the amount due in an exhibit.

This averment, then, in the answer, is taken as an averment of the fact that interest was paid up to, and until after the suit was commenced, would be no defense to the amended or supplemental complaint. The amount of interest is a matter to be settled on a reference—a dispute as to the amount is not a defense, if any is due. Besides, in all actions of this nature, the decree must be for all sums due when the decree is rendered, not merely what was due at the commencement of the suit. (4th Ed.) 2 Hilliard on Mortgages, pp. 211, 218–9, note a; 14 Wis. 350; 11 Paige, 330; 11 Mch. 384; 11 Penn. 282; 45 N. H. St. 141; 7 Ohio, 231; 20 Ga. 342; 41 Miss. 284.

Interest due under a mortgage and in arrear, an action will lie though no part of the principal be due. 16 Ind. 45; 2 Vol. Hill. on Mortgage, 4th Ed., pp. 216, 219, note; 18 Cal. 460; 2 Bl. 500.

Power to sell under mortgage does not oust equity jurisdiction and a judgment for interest proper on such a mortgage. It is treated as a power of attorney. 1 Hilliard on Mort. p. 131; 26 Iowa, 253; 1 Jones, 290; 6 R. J. 542; 2 Cliff. C. C. 454; 54 Penn. 127.

There is a power of sale given under the statute, to the Governor, upon default, for twelve months. It is not improper to have it judicially determined whether default has occurred for twelve months, and a judgment for interest for that period will be conclusive and relieve the Executive from the responsibility of deciding that question. When the amount of indebtedness is in dispute this course is desirable. The case in 54 Penn. *supra*, was a suit at law upon the bonds, and the same rule applies in a suit upon the coupons.

*Prayer of Complaint.*

What relief may be granted? Upon answer, prayer is of no use and unnoticed. Voorhies' Code, p. 424.

Under the Code practice, the defendant having answered, the plaintiff is entitled to any relief consistent with the case made by the complaint. Code, Sec. 221; 40 N. Y. 510; 37 N. Y. 494; 39 N. Y. 287; 10 N. Y. 51.

The last two cases above cited illustrate the rule in both cases; different relief was granted than that contemplated by the pleadings. Vide Voorhies' Code, pp. 425–6.

A careful examination of the supplemental complaint, and Holland's answer, will show that there is no issue of fact or facts that are a defense to the action furnishing any bar to the action by the State.

Subdivision 7th of answer, makes an issue of fact with the co-plaintiff Trustees, but the latter do not demur.

Subdivision 9th alleges that the bonds were illegally issued, and therefore illegally exchanged, and consequently the company was not indebted to the State at the commencement of the suit.

The fact here averred is predicated upon a conclusion of law.

A demurrer only admits facts that are relevant and well pleaded, not conclusions from the facts. 9 Barb. 297; 11 How., N. Y. 26; 10 Abb. 370; Voorhies' Code, 205.

The rule, that on demurrer judgment will be given against him committing the first error, is abrogated by Sec. 14 of act passed July 8, 1861. 11 Fla. 80.

The objection was raised, in the court below, that the State cannot collect interest from the company, because it has not paid interest on its bonds. This is hardly worth noticing. It goes to the consideration paid by the State, which I have shown cannot be inquired into by the defendant.

Besides, *a promise* for *a promise* is a consideration; and the the theory of the law under which the bonds were exchanged is, that the company should first pay the State, and thus furnish money to pay the interest on its bonds and prevent a resort to taxation.

Holland v. The State of Florida et al.

Objection was taken in argument in Court below, that the State and Trustees could not join as plaintiff. *Technically an objection of multifariousness.*

Under the Code, this objection can only be taken by demurrer. Code, Sec. 95.

This objection in equity must be taken before answer. 5 How. 127.

But Holland does not make the objection in his answer, and, all objections not taken by demurrer or answer, are deemed waived. Code, Sec. 99.

The State and Trustees are substantially but one person. The causes of action arise differently, it is true, but both are interested in the subject matters, and must therefore be made parties. It would be extremely awkward for the State to make the Trustees defendants, and the Trustees could not make the State a defendant. They could not be placed upon the record in any other way than they are, and being upon the record the court will give such relief as each is entitled to.

"All persons having an interest in the subject of the actions, and in obtaining the relief demanded, may be joined as plaintiffs, except as otherwise provided in this title." Code, Sec. 68, Sec. 70.

"Several causes of action may be united in one action, when they all arise out of transactions connected with the same subject of actions." Code, Sec. 117.

"Court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not effect the substantial rights of the adverse party, and no judgment shall be reversed or affected by reason of such error or defect." Code, Sec. 126.

It was intended in the court below, that Holland's answer in the suit in the Supreme Court of the United States is made a part of the supplemental complaint in this cause, but it will be seen by reference to the supplemental complaint that said answer is merely referred to as an exhibit to

prove that Holland admitted the appointment of a receiver in this cause.

Jurisdiction of the court below has not been raised by the defendant. Should it be, I respectfully refer to my brief on this point, on the first appeal in this cause, heard by their Honors Justices Westcott and Fraser.

It will be borne in mind, that the company in its answer, admit the lien of its bonds upon the road, and in the deed of trust to Chase *et al.*, made an exhibit to the amended and supplemental complaint. The company admits the receipt of all the State bonds; admits the lien of the bonds upon its property, and provides therein for the payment of interest.

Holland, claiming under the company, is bound by these admissions upon the doctrine of estoppel.

These admissions in the answer of the company, are evidence against Holland. Admissions of a co-defendant is evidence for the plaintiff against a defendant claiming under the defendant making the admission. 2 Daniels Chy. 839; 1 Greenleaf Ev., Sec. 178.

### Purchaser Pendente Lite.

Holland acquired his interest, such as it is, if any, pending the suit against the company, and a party so purchasing is bound by the decree even though he is not made a party defendant. 1 Story's Eq. Juris., Secs. 405, 406.

It is admitted on the record that the company is insolvent. The fact that it suffered Holland to levy upon and sell its property, is evidence of that, and it must be apparent that his object is to retain possession of the road, and put the earnings in his pocket to the injury of the State.

It is apparent that the property is insufficient in value to satisfy the lien of the State.

In Pennock vs. Coe, Trustee, 23 How. 117, the holder of a second mortgage bond recovered judgment upon the bond, and levied upon the property, and advertised for sale. The

suit was brought by the Trustees for holders of the first mortgage bonds to enjoin the sale, and a perpetual injunction was granted; and, it appearing in that case that the property was not sufficient to pay the first mortgage bonds held, that the judgment creditors had no interest in the property.

The same principle should apply in this case. It is clear that the State had an equity to enjoin the sale by Holland, and it is equally clear that it has an equity to have Holland enjoined from taking any benefit or fruit by the sale. If injunction was proper before the sale it is proper now.

Admitting, for argument, that Holland purchased all the interest the judgment debtor had, still he is in the situation of a party purchasing property, with a mortgage upon it, for double what it is worth.

The appellee submits that the judgment of the court below should be affirmed; and the defendant, not asking to amend, the State can apply to the court below for a final decree declaring and adjudging the rights of the parties. The amount of interest can be ascertained and embraced in the decree, and a long step taken towards the end of this railroad warfare.

The State is contending to have the question of the validity of its lien put at rest. This settled, all the litigations are easily ended, and the holders of the bonds of the State stand ready to surrender them to the State, and take a bond upon the railroad; thus relieving the State of the disadvantage of injury upon her credit arising from the outstanding of $400,000 of her bonds. This is a worthy and honest object, creditable to any citizen, lawyer or Judge. All obstacles in the way of accomplishing this end interposed by individuals for private gains should be swept away. All alleged interest set up by any person since the lien of the company bonds in the hands of the State attached to the property should be held subordinate to the rights of the State, and

by the decree of the court be made to yield to those paramount and superior rights.

Upon well-settled principles, it is clear, if Holland had not been made a party to this suit, being a *purchaser pendente lite*, he would be bound and concluded by any decree rendered in the case; and, he having been brought in to afford him an opportunity to be heard upon his rights and merits, if he has any, any objection made by him of improper joinder of plaintiffs of causes of action, or any objection not going to the merits or substantial rights, comes with no force from him, especially if he does not take them by his answer.

As to the demands of the State, all the defendants have pleaded to the merits. The validity of the bonds; their lien upon the property; the amount of interest due; the legal and equitable rights of all the parties are presented upon the record. The court has jurisdiction of all the parties. Its judgment will be binding upon them, so far as the Trustees are concerned. A decree has been rendered for them against the company. The case is at an end. Had Holland not been made a party, he would have been concluded by said decree, whether or not he is now; and what his rights are, can as well be determined upon this record as any other.

Courts of equity abhor multiplicity of suits, and delight in one suit to adjudicate upon the rights of all persons claiming interests in the property, and give repose to litigation, in the present State of the record, with the parties at issue upon the merits, after protracted litigation. The objection of Holland that two causes have been joined, that the suit by the State should be dismissed and commenced anew, is repugnant to equity—contrary to the provisions and spirit of the Code—and shocks the mind of a court of equity. To such an objection a court of equity will turn a face of flint.

The solicitor for appellee, by way of apology for the

length of this brief, desires to state that it has been written in anticipation of not being present at the hearing.

If any questions shall be raised by the appellant not herein discussed, and the court shall desire any argument from the appellee, it will be furnished upon notice.

WESTCOTT, J., delivered the opinion of the court.*

The judgment of the court below, from which this appeal is taken, was a judgment sustaining the demurrer of the State to the answer of defendant, Daniel P. Holland. Defendant, Daniel P. Holland, claims to be the owner of the road and of the franchises granted to the corporation known as the Jacksonville, Pensacola and Mobile Railroad Company, by virtue, as he alleges, of a purchase of all of the property and franchises of that corporation at a sale under an execution obtained by him against the corporation, he being the purchaser at such sale.

The State, while denying the validity of any such sale under the statutes of this State, affirms that it is immaterial what passed at said sale; that the State had a lien upon all of the property and franchises of the corporation ; that this lien existed anterior to the rendition of the judgment ; that such lien is and was admitted by the corporation ; that Holland can claim only through the company ; that he takes by his sale, if anything, the interest of the defendant in execution, and no more.

I do not propose to determine whether such sale as defendant Holland claims was here had was void, or was authorized by the statutes of this State, and upon this subject will simply say that this is an open question in this State. The determination of this question is not necessary to the disposition of this case, and I examine the case upon the hypothesis that such sale can be had, this being all that the appellant here can or does ask in this respect.

*RANDALL, C. J., and VAN VALKENBERG, J., had been counsel in the case, and Judges BRYSON and GOSS were called in.

While the entire court agrees with me as to the equities and present status of the State, and as to the propriety and necessity of determining her rights in the premises, yet the other members of the court go further, and decide whether such sale, as is claimed was here had, was authorized by the statutes. Upon this question I express no opinion further than to say that the general rule is that such sale cannot be had unless it is authorized by statute. As to the effect of the statutes of this State, I express no opinion.

Do the facts, which the State sets up in the complaints, original and supplemental, and not put in issue by defendant, Holland, show equities which entitle it to a sale of the property and franchises of this corporation, and the application of the proceeds to the payment of the indebtedness alleged, notwithstanding the purchase by Holland?

The effect of such a sale as is claimed was here had by Holland, when viewed in reference to the rights of parties holding a prior and paramount lien, differs in no essential point from other sales of property under junior securities or liens.

In speaking of precisely such sale as Holland here claims was had, that is, the sale of all the property and franchises of a corporation by a judgment creditor under a statutory power, and in determining its effect with reference to prior liens upon the property or equities against the judgment debtor, Mr. Justice Bradley, speaking for the Supreme Court of the United States (11 Wall., 476 and 477) says: "A sale under a junior security must be subordinate to one that is prior and paramount. Successive sales of the same franchises can no more be deemed incompatible than successive sales of the same property; and we all know that a sale of land under a judgment does not in the slightest manner affect a prior mortgage. A subsequent sale of the same land may be made by virtue of the latter." "If the company are estopped, then those who purchase the property of the company at an execution sale must be estopped."

It has frequently been held that such a purchaser takes only the right, title and interest which the debtor had, subject to the equities which existed against the property in his hands when the judgment was recovered." This doctrine as to ordinary sales of land by judgment creditors, the plaintiff in execution being the purchaser, is universally acknowledged by all the States. In the case just referred to, it is applied to precisely such sale as is claimed was here had. "The purchaser has a right to what he gets and sells," and nothing more. *Caveat emptor* is the rule. He takes only the interest of the defendant. If the defendant has no interest, then the buyer gets nothing. (McGee vs. Ellis, 4 Litt. 244; 18 Vmt. 390; 4 Dev. & Batt. 160; 4 Litt. 244; 14 Vmt. 325.)

If, therefore, the State has any equitable lien superior and prior to Holland, and this lien is in a condition to be enforced and no good defense to the action is urged, that is an end of the case. To this question I address myself.

The claim of the State arises from bonds of the Jacksonville, Pensacola & Mobile Railroad Company, which were exchanged by the company with the State for bonds of the State. This exchange was made under the provision of an act entitled "An act to alter and amend an act entitled an act to Perfect the Public Works of the State, approved June 24, 1869; approved January 28, 1870." This act provided: "That in order to aid the said Jacksonville, Pensacola & Mobile Railroad Company to complete, equip, and maintain its road, and to aid in perfecting one of the public works embraced in the internal improvements of the State, the Governor of the State is hereby directed to deliver to the President of the said company coupon bonds of the State to an amount equal to sixteen thousand dollars per mile for the whole line of road and length of railway owned by or belonging to said Jacksonville, Pensacola & Mobile Railroad Company in exchange for first-mortgage bonds of said railroad company of the denomination of one thousand dollars,

when the President thereof shall certify upon his oath that the road or parts of road for which he asks for an exchange of bonds is completed and is in good running order. The said bonds shall be of the denomination of one thousand dollars, signed by the Governor, countersigned by the Treasurer, sealed with the great seal of the State; shall bear eight per cent. interest, payable semi-annually, and shall be payable to bearer. They shall be dated on the first day of January, A. D. 1870, and shall be due thirty years thereafter, and principal and interest shall be payable at such place in the city of New York as the Governor shall designate. The coupons for interest shall be payable to bearer, and shall be authenticated by the written or engraved signature of the Treasurer: *Provided, however*, That whenever the Jacksonville, Pensacola & Mobile Railroad Company shall or may determine to pay the interest in gold for or upon their bonds, or the bonds designated in the tenth section of an act entitled an act to Perfect the Public Works of the State, approved June 24, 1869, upon giving notice to the Governor of such intention, then the State bonds aforesaid and the coupons for interest on said bonds shall be payable in gold, notice of which shall be given by the Governor in some paper published in the city of New York and at the capital of this State, to be designated by the Governor."

The 10th section of the act of June 24, 1869, provided that "in exchange for the bonds of the State above described, the President of the company shall deliver to the Governor of the State coupon bonds of the company, bearing a like rate of interest, payable to the State of Florida, authenticated by the written or engraved signature of the President. The bonds shall be of such denomination, not less than one thousand dollars, as the said company may choose, and principal and interest shall be payable at the same time and place as the aforesaid State bonds."

The act of 28th January, 1870, provided: "To secure the principal and interest of the said company bonds, the State

Holland v. The State of Florida et al.

of Florida shall, by this act, have a statutory lien, which shall be valid to all intents and purposes as a first mortgage duly registered on the part of the road, for which the State bonds were delivered, and on all the property of the company, real and personal, appertaining to that part of the line, which it may now have, or may hereafter acquire, together with all the rights, franchises, and powers thereto belonging, and in case of failure of the company to pay either principal or interest of its bonds, or any part thereof, for twelve months after the same shall become due, it shall be lawful for the Governor to enter upon and take possession of said property and franchises, and sell the same at public auction, after having first given ninety days' notice, by public advertisement, in at least one newspaper published in each of the following places: The city of New York, in the State of New York; the city of Savannah, in the State of Georgia; and the city of Tallahassee, in the State of Florida, for lawful money of the United States, and for nothing else, except that the State, for its own protection, may become the purchaser at said sale, and may pay on said purchase any evidences of indebtedness the State may hold against said road, which purchase money, or said evidences of indebtedness, shall be paid on the day of sale into the Treasury of this State, or within ten days thereafter; and all moneys arising from said sale, and paid into the Treasury of this State, as heretofore prescribed, shall be promptly and exclusively applied to the payment and satisfaction of the bonds issued by the State of Florida under this act; and in case the holders of said bonds do not present them for redemption within ninety days after said sale, the Treasurer shall invest the same, or any part thereof, which may be remaining in his hands, in the securities of the United States, to be held by the State of Florida, as Trustee for the bondholders, until said bondholders shall demand the same, upon which demand the Treasurer shall immediately turn over or pay said securities to the bondholders. The

purchaser or purchasers of said road shall be by said sale possessed of all the rights, privileges, and franchises of said defaulting company, together with the franchise of use and being a body politic; and the Governor shall, upon the payment of the said purchase money into the Treasury of this State as above provided, immediately cause the purchaser or purchasers of said road, at said sale, to be placed in the actual possession, use, and enjoyment thereof, and cause all the books, papers, and real and personal property of said company of every description, together with the franchise of use and being a body politic and corporate; and may use any new corporate name they see fit, and make and use a new seal, upon signifying their action in writing to the Governor, and thereafter may exercise all the rights of a body corporate, and privileges thereof, and of said defaulting company, under said new name for the term of thirty-five years, to date from the time of the purchase as aforesaid. That any such sale shall be ratified by the Legislature before the same shall become effective."

This act further provided: "That the Governor shall, for the purpose of further aiding said Jacksonville, Pensacola & Mobile Railroad Company in the speedy construction of its road, deliver to the President of the said company coupon bonds of this State, of the same character as those above described in this act, to the amount of sixteen thousand dollars per mile, upon receiving for and from the President of said company first mortgage bonds of like amount, on any part or portion of the road between Quincy and Jacksonville: *Provided, however,* The State bonds under this section shall not be exchanged for first mortgage bonds for a greater length than one hundred miles of any part of railroad between Quincy and Jacksonville: *Provided,* The said railroad company or companies shall not issue first mortgage bonds to a greater amount than sixteen thousand dollars per mile."

The first question which arises in reference to this legisla-

tion is whether it was within the power of the Legislature to issue the bonds here authorized to be issued. The Constitution authorizes the Legislature to issue bonds "for securing the debt, for the erection of State buildings, support of State institutions, and perfecting public works." This court has already determined and decided that this clause in the Constitution is a limitation upon the power of the Legislature in the matter of issuing State bonds.

In Cheney, *et ux.*, vs. Jones, 14 Fla., 587, this court, in construing this clause, said: " The power of the Legislature of this State over the subject of issuing State bonds is limited by the provisions of the Constitution, because it has prescribed the several subjects and occasions for and upon which the Legislature may authorize their issue." " It is not necessary that a limitation of power should be framed in express terms. If a power is granted to do certain things, as, for instance, the levying of taxes for certain specified and enumerated purposes, and it is not *essential* to the carrying out of the purposes of the government that any such power should be exercised, except for the purposes specified, the effect of such prescriptions is equally prohibitory as to the purposes not specified, as though the prohibition were declared in affirmative terms. (Cool. Con. Lims, 64, 87, 176; 15 N. Y. R. 543; 30 Iowa, 9; 13 Mich. 127, 158; 21 Pen. St. 147; 1 Story's Con. Sec. 448.) " In speaking of the power to issue bonds, a question involved in the case, the court said: " And as to the power to issue bonds of the State the Constitution provides that the Legislature shall have power for issuing State bonds, bearing interest, for securing the debt, and for the erection of State buildings, support of State institutions, and perfecting public works, and by the same rule founded in principle, and sustained by authority in unbroken currents, it is equally prohibitory as though it should declare that the Legislature shall have no power to provide for the issue of bonds, except for securing the debt," &c.

"The power of the Legislature to issue bonds was circumscribed and limited to the issuing of bonds for securing existing public indebtedness, the erection of State buildings, the support of State institutions, and perfecting public works. The Constitution has specified these as the objects for which bonds may be authorized. The purpose and intent of the Constitution must have been to limit the exercise of the legislative power upon this subject, for we must impute to it some purpose, and some object to be accomplished by it. If that was not the object, we must disregard it entirely, for it would be utterly meaningless."

This clause being thus a limitation upon the power of the Legislature, the question next arising is, is the line of road, authorized to be aided by the act, one of the public works, to perfect which the Legislature was authorized to use the credit of the State?

What were these public works? We do not think that this question can be better answered than in the language of the Justices of this court, in reply to an Executive communication, bearing date the 6th of February, A. D. 1871. (13 Fla. 699.)

Two of the questions propounded in the Executive communication of the 6th of February, A. D. 1871, were: "Are railroads public works referred to by the Constitution? Has the Legislature power, under our Constitution, to aid in the construction and completion of these public works?" To the first question Chief Justice Randall replied (13 Fla. 721): "I answer that, according to the common idea as to what a railroad is, they are public works. They are constructed, whether by the State or the citizen, for the use and convenience of the public for purposes of travel, of facilitating commerce and commercial and social intercourse, of affording markets for all the productions of the country. They enhance values, encourage and promote immigration, increase the extent of productive agriculture, and are like natural streams—public necessities, the highways upon

which all may travel and transact business, access to them being open to all the people on equal terms, and can be denied to none. The action of the several branches of the Government of this State, in reference to railroads and like enterprises, and in view of which action the terms of the Constitution were doubtless used, have given us an unmistakable guide in determining the meaning of such terms employed in it on this subject as seem to require interpretation."

To the second question, which was, "Has the Legislature power, under our Constitution, to aid in the construction of these public works?" the Chief Jussice replied: "This, in the form presented, admits, in my judgment, neither an affirmate nor a negative answer. The language of the Constitution is special. The term 'perfecting' does not mean in its broad sense, 'constructing' public works. If the framers of that instrument had intended that the Legislature might have power to authorize an unlimited bonded indebtedness for the general inauguration and construction of public works, they would not have used *a term which merely includes the completing or finishing works of public utility already authorized and incomplete*. As is suggested by my brother Westcott, and as everybody knows, who has examined the legislation of this State and recognizes the existence of a system of internal improvement, long since inaugurated by the people through the legislative branch of the State Government, this system was in progress of development and completion at the time of the adoption of the Constitution. There was but one system or series of such public measures in progress, and none, I believe, under the exclusive control of the State. My opinion is, that the terms 'perfecting public works' refers strictly to the completion of such public works, including railroads, as were projected and in progress, or partially constructed, at the time of the adoption of that phrase in the fundamental law of the State."

In answer to the same Executive inquiry I used this lan-guage : " The clause, an interpretation of which you desire, is as follows : ' The Legislature shall have power to provide for issuing State bonds, bearing interest, for securing the debt, and for the erection of State buildings, support of State institutions, and perfecting public works.' " Upon the face of this clause it is seen that the term public works is used in contradistinction to State buildings and State insti-tutions. If this is not so, and a public work, within the meaning of the clause, is the same thing as a State institu-tion or building, then the term public works is surplusage—is unnecessary. This court held, in 12 Fla. 205, an early case involving the construction of a clause in the Constitu-tion that such a construction of a clause in the Constitu-tion as made one portion of it surplusage is not to be given, if the clause in question is capable of receiving another in-telligent and consistent construction. The term " State building " has a more enlarged signification, indicating, in a limited and strict sense, such institutions as the State es-tablishes to discharge its duty in the matter of the admin-istration of the criminal laws, such as State prisons, as well as such as it establishes to discharge its duty to the unfor-tunates of society, such as the indigent, insane, the deaf and dumb, the blind, and others in like conditions. The terms " perfecting public works," in my opinion, clearly indicate, and mean, that works of a public character, already com-menced, are to be perfected. They indicate something in-choate, something began, but not " perfected," and which should be perfected or finished. The inquiry at once pre-sents itself, were there any such works of this character and in this condition when the present Constitution was framed ? It is unnecessary to cite authorities to show that a clause of this character, in a Constitution framed under the circumstances that our present Constitution received its existence, must be interpreted in the light of the then present conditions of things, as well as with reference to the

past legislative and judicial history of the State in this respect. In the light of the past history of this State, and guided by the action of the Judicial and Legislative Departments of the Government, I inquire, what unperfected public works are here referred to? At once we say that these words cannot, and do not, refer to any works owned exclusively by the State, for there were none such, either commenced or perfected. There was no such thing as a State institution, in its strict sense, existing in the State, to which these terms could be held to apply. What had been the action of the Legislative, Executive and Judicial branches of the Government upon this subject anterior to that time? The first Constitution of this State—the Constitution of 1839—was framed by a body of men of distinguished ability—by men who knew what were the proper functions and the legitimate powers of a State in the complex system of government obtaining in this country—by men who understood as well the State's proper relations to the General Government as they did her duties to her own citizens. Believing, as they no doubt did, that it was the peculiar, if not exclusive province of the State to aid in the construction of internal improvements, the benefits of which should be confined principally to State limits, and that it was proper to invest the Legislative Department of the Government with the discretion of determining what were proper objects of State bounty, they adopted the following clause covering that subject: "A liberal system of internal improvements being essential to the development of the resources of the country shall be encouraged by the Government of this State, and it shall be the duty of the General Assembly, as soon as practicable, to ascertain by law proper objects of improvement in relation to roads, canals and navigable streams, and to provide for a suitable application of such funds as may be appropriated for such improvements." This body having the best reasons (derived from many sources, but particularly from the history of the Ter-

ritory of Florida) for prohibiting the issue of State bonds, or pledging the faith of the State, for any purpose of this kind, inserted another clause in that Constitution which provided that " the General Assembly shall not pledge the faith and credit of the State to raise funds in aid of any corporation whatever."

The effect of this Constitution was, therefore, to acknowledge this duty, and, while providing ample power for its discharge, it established such a check as would save the State credit and prevent that financial ruin which generally follows an unlimited power in the Legislature to pledge the credit of the State for such purposes. It could aid by an " application of the funds appropriated," but it could not pledge the faith or credit of the State to raise such funds. In 1845 Congress appropriated for the purpose of internal improvements in this State five hundred thousand acres of land. Notwithstanding this mandate of the organic law and this bounty by Congress, and notwithstanding the fact that Florida nearly equalled in square miles of territory the States of New York, New Jersey and Connecticut, making such improvements a great necessity, no established line of railway affording any considerable facilities to the people of the State was constructed for years. In 1855 a *system* of internal improvements was provided for by an act entitled " An act to provide for an encourage a liberal system of internal improvements in this State." The five hundred thousand acres of land granted for that purpose by Congress, as well as millions of acres of what is known as swamp lands, were constituted a fund for the purpose of internal improvements, and the Legislature designated certain lines of railway and canals as proper improvements to be aided from this fund. Quite a number of cases have been adjudicated in this court, in which the companies entrusted by the State to construct the lines of railway indicated have been parties, and the courts, in speaking of these contemplated improvements, have styled them " great pub-

lic enterprises;" as "enterprises in which the public have interests." This court, in 1862, said that it could not forget that the community have rights in reference to these improvements, and that the happiness and well being of every citizen depends on their preservation. Mr. Justice Walker, of this court, in 1862, speaks of this act as one "inaugurating a great constitutional *system*; a system which has enabled the State of Florida, the weakest in population among her sisters, to build more railroad in the same length of time than any other State in the world." At the time of the adoption of the present Constitution, the system of public improvements had advanced greatly. There were a number of lines of road in operation, but there was a considerable and very important portion unfinished. The highest interest of the State required its completion. With this system incomplete, the capital of the State was reached with difficulty by citizens south and west, and many of the people in the western portion of the State were anxious, for the want of these facilities, combined with other reasons, to become a portion of the State of Alabama. In my opinion these incorporated lines of railway, and the internal improvements contemplated in the system created by the act referred to, were the unperfected public works which the Constitution of 1868 contemplated should be "perfected."

We next inquire: Is the road authorized to be constructed by this act one of the internal improvements designated by the act of January 6, 1855, which organized a State system?

The line of road which the Jacksonville, Pensacola & Mobile Railroad Company was authorized by this act to construct was a railroad from Quincy, Florida, to the dividing line between the States of Florida and Alabama, in the direction of the city of Mobile, Alabama, crossing the Pensacola and Louisville Railroad, with the privilege of continuing the same to Mobile, and of connecting with any railroad running to Mobile.

The internal improvement act, which gives us the lines of

road and canal which were embraced in the system, provides: "That a line of railroad, from the St. Johns river, at Jacksonville, and the waters of the Pensacola bay, with an extension from suitable points on said line to St. Marks river or Crooked river, at White Bluff, on Apalachicola bay, in Middle Florida, and to the waters of the St. Andrews bay, in West Florida, and a line from Amelia island, on the Atlantic, to the waters of Tampa bay, in South Florida, with an extension to Cedar Keys, in East Florida ; also a canal from the waters of the St. Johns river, on Lake Harney, to the waters of Indian river, are proper improvements to be aided from the Internal Improvement Fund."

A reference to the contemporary recommendations of the Executive Department of the State and of the Board of Internal Improvement will give us some light upon the subject.

The Governor, in his message of November 24, 1854, uses this language (Message of the Governor, November 24, 1854, Journals of 1854) : "The framers of the Constitution were deeply impressed with the importance of a liberal system of internal improvements, and provided that such a system should be encouraged by our State Government. The time has probably arrived when our duty to ourselves and our constituents requires us to fix upon and adopt a State system, and determine the extent to which we can, as a government, aid in its construction. I feel no hesitation in declaring that, in my judgment, no State system will be worthy of the name which fails to connect Fernandina, or some other equally accessible point on our Atlantic coast, with Tampa bay in the south, and Pensacola bay in the west. These two, as great main trunks, would form the basis of a system which would be worthy of the sea-girt State."

On the 22d of December, 1854, the Board of Internal Improvement made a report to the General Assembly, in which they say : "We have thought it best to recommend the concentration of these means upon a system of improvements, having reference to the wants of general commerce as well

as local necessity, for the growth of the State in population and wealth being thus most rapidly developed, the means necessary for local connections and improvements would very soon be produced. The system we recommend for aid consists of a railroad between the waters of Escambia bay and the St. Johns river, at Jacksonville, with an extension from suitable points on the line to the waters of St. Andrews bay, in West Florida, and the St. Marks river, in Middle Florida, and from Amelia island, on the Atlantic, to the waters of Tampa bay, in South Florida, with an extension to Cedar Key, in East Florida, and to connect the country east of the St. Johns with the system, and thus to comprehend that section more fully in its benefits, we recommend, also, the construction of a canal to connect Indian river with the St. Johns. In adopting a system, it was necessary to ascertain if we possessed within our own borders suitable harbors upon the two seas for the accommodation of the commerce which would pass over our roads, for otherwise it would be necessary to point our improvements to suitable connections with the system of our neighboring States." After mentioning Pensacola and Fernandina as suitable harbors, and particulars as to depth of water, &c., the board then state: "We have felt justified, therefore, in resting our system upon ports located within our own limits."

The act of Congress of May 17, 1856, which proposed to aid this system, extended aid for the construction of a railroad from St. Johns river, at Jacksonville, to the waters of Escambia bay, at or near Pensacola. The then Constitution of the State directed that a liberal system of internal improvements should be encouraged by the government of this State. Thus we find, from a simple examination of the statutes, that when the Constitution of 1868 was adopted, there was no public work authorized from Quincy to Mobile, or to the Alabama line in the direction of Mobile, and we find that it was the purpose of this legislation to secure a State

system with the terminal points of the several roads at harbors within the State.

It may be said that a large portion of the road to be constructed by the Jacksonville, Pensacola & Mobile Railroad Company is in the direction of Escambia bay, but, upon mature reflection, I do not think that the Consitution can be held to sanction aid to an enterprise of this character to the Alabama line in the direction of Mobile, notwithstanding a part of the line might be available in reaching the waters of Escambia bay. Such a material change as this in a railway charter would release the subscribers to stock from any obligation to pay calls. It would be a fundamental alteration, as distinguished from an alteration only auxiliary to the main design. (1 N. H. 44; 11 Ga. 438; 29 Vmt. 545; 8 Mass. 268; 18 Ib. 384; 13 Beav. 7; 3 Eng. Law & Eq. 144; 10 Beav. 1; 9 Fla. 311.)

No one at all conversant with the history of the internal improvement system of this State can hesitate to say that a line of road from Quincy to Mobile was not embraced in that system. The object and purpose of the authors of that system was to restrict the terminal points of the lines of railway to harbors in the State, and changing these terminal points, looking to connections with Mobile, is a fundamental and material alteration. The charter of an ordinary private corporation is a limitation upon the power of the Legislature and the company, when either proposes to act with reference to the shareholder, and it cannot be denied that such a change as is here made would release him from calls. The Constitution here is a limitation upon the power of the Legislature when it proposes to pledge the credit of the State or bind her people by the issue of bonds. I think the nature of the subject to which the limitation applies is such as to require a liberal construction in behalf of the people, and that no act of the Legislature which pledges the credit of the State and involves a resort to taxation should receive judicial sanction where there is such a difference as here exists between

what the Legislature is authorized to do and what it has done. The limitation must receive a reasonable construction, and while I admit and approve of the general rule that the legislative construction of the Constitution is entitled to great weight, yet in a case of clear error, as I deem this to be, the duty of the judiciary is plain.

The Legislature must be held to some limitation in the matter, and looking to the executive, legislative and judicial history of the State, it is too clear for doubt that a line of road from Quincy to Mobile cannot be held to be a public work within the meaning of the Constitution, as it has been heretofore defined by the justices of this court. Such a road is beyond and outside of the general scope and design of the original enterprise, and the Constitution does not authorize the Legislature to aid any other railway than those embraced in the then existing system. It may be said that the road to Mobile will be of much greater benefit to the people, and other suggestions of like character may be made. With questions of policy of this character this court has nothing to do, and they should not and do not weigh one grain in reaching a conclusion. The bonds of the State of Florida here authorized to be issued are, therefore, unconstitutional. The power of the Legislature is limited in this respect, and the bond here sanctioned is not embraced within the limitation. One of the consequences of this is that neither the State nor her people are bound for the bonds now in the hands of those who hold them. No doctrine of estoppel can operate against the State.

It is contended upon the part of defendant Holland that another consequence is that there is no lien upon the property and franchises of the company which can be enforced at the suit of the State; that with the failure of its obligation there is a failure of any equity existing in its behalf; that there is no consideration from the State to the railroad. We will not here repeat the various sections of the law which define the relation of the State, of the foreign bondholder,

and of the company towards each other. A careful and strict examination of this statute will show that the State of Florida was to occupy two distinct and different relations to the holders of the State bond and to the company. The first relation was that of primary debtor to the holder of the State bond, under and by virtue of the obligation of this bond, and also of mortgage creditor of the company, under and by virtue of the bond of the company. The right of the State, viewed in this light, was to be simply that of a mortgage creditor of the road, and its liability to the holder of the State bond was that of a simple bond debtor. In this relation the holder of the State bond was to have no security for his protection and payment except the liability of the State in its own right and its good faith and capacity; the State at the same time as a result of this relation being given, for its own protection against this bond debt, the right to become the purchaser at the sale of the road and to pay for it in the bonds of the company. The other relation which it was to occupy was, in the language of the act, "a trustee" for the holders of the State bonds. In this relation the lien created by the statute was for the benefit of the holder of the State bonds. The proceeds of the sale, if he declined to surrender his bonds, were to be invested for him, and he was to have the beneficial interest of a *cestui que trust*. The lien of the statute and the company bond, viewed in this light, was for his benefit, and the property and franchises of the company were to be his security for payment. And as the company received his money and the State received nothing, the company was to be held to the obligation of common honesty in the matter of payment and satisfaction. There are other things in this statute besides the express declaration that the State is a trustee which sanction this view of the State's relation. The company could, by its own act, change the nature of the claim of the State bondholders for interest to that of a gold-bearing bond. The act provides no special method for the payment of the State bond and inter-

est as distinct from the liability of the company to the State, and it is apparent that the State herself was to look to the company for the interest which the bondholder was to receive. All of these things show that the State was to be the instrument or trustee through whom a liability of the company to the bondholder should be discharged. This, coupled with the express declaration of the statute, leaves no doubt of this additional relation of the State. To this relation I know of no constitutional objection. There being no primary liability of the State, it would seem to be a consequence that such portions of the act as exists for its protection against such liability as the Legislature presumed the State incurred, would fail and cease to be operative, and I am inclined to this view. But, however this may be, the recent amendment to the Constitution of the State prohibits the State from becoming any such owner or stockholder in a corporation as the statute authorizes the purchaser to become in this case. That amendment (Article XIII.) provides that " the credit of the State shall not be pledged or bound to any individual, company, corporation or association, *nor shall the State become a joint-owner or stockholder in any company, association or corporation.*" What is meant here by the terms "joint-owner or stockholder in a corporation?" Such terms as these, when used in reference to the State, are not applicable to strictly public corporations, such as are founded by government for public political purposes, as towns, cities, parishes and counties, because such a thing as the State becoming a stockholder, or part owner in such a corporation, is impossible from the very nature of the relation between such corporations and the State. The term *part owner* of a corporation is also rather indefinite, unless the word corporation is used here in the same sense as franchise. Says Mr. Justice Blackstone, (2 Com. 37) : "It is a franchise for a number of persons to be incorporated and exist as a body politic with a power maintain perpetual succession and to do corporate acts, and each individual of such corporation is

said to have a franchise or freedom." This clause clearly prohibits the State from becoming a part owner of the franchise to be a corporation, and other franchises appertaing to corporations for ordinary, commercial and business purposes, such as a company with power to operate a line of railway or bank. Where the capital stock in such a corporation is owned by private persons, it is a private corporation. The act of the Legislature here would make the State the sole owner of the stock and franchises in the event it became the purchaser, and in such case the result would be simply that the corporation would be a public and not a private corporation, and would be under the control of the Legislature, the same as municipal corporations. There would be no such vested rights of property as are beyond the control of legislative authority. (Dartmouth College case, 4 Wheat. 518.) We cannot, however, see that this can make any difference. The State would be the only and sole stockholder in such corporation, and that is prohibited. The command of the Constitution to the State is that it shall not be a "stockholder *in any* company, association or *corporation.*" The prohibition extends as well to a public corporation of this character as to a private one. And it is well that it does, for such a corporation, if a source of profit to the State, would be a fund to tempt her officers, and if it resulted in loss, would be a burden to her people, unless they hoisted the flag of repudiation behind the shield of sovereignty. Those who administer a government and exercise powers executive, legislative and judicial, appertaining thereto, can well be prohibited from running and operating railways, banks and other commercial institutions. If these persons perform honestly and properly the trust of administering the government, the people will be satisfied. In this amendment, the people have said that such persons shall not, as their representatives, involve them in such undertakings.

Having thus defined the status of the State, and her general rights as trustee under the statute, it is only necessary

to consider the questions presented by the particular pleadings in the case to ascertain whether the State's equities are now operative.

The complaint alleges an exchange of bonds by the J. P. & M. Railroad Company and the State to the amount of three millions of dollars on that part of the road which defendant Holland claims to have purchased under a *fi. fa.*, the complaint alleging that this exchange was made at the rate of $16,000 per mile in bonds. That before such exchange the President of the road filed with the Governor of the State the certificate required by the act. The amended complaint of June 22, 1872, alleges non-payment of the interest on the State bonds, and that on the first of July, A. D. 1870, there was due as interest on the bonds of the company held by the State the sum of $120,000, and that on the first day of July, A. D. 1872, there will be a further sum of $160,000, which will have remained due and unpaid twelve months. Defendant Holland was brought into the case by a supplemental complaint filed March 24, 1874. This complaint states that Holland recovered his judgment since the commencement of this action, and that his sale was had while this suit was pending. The supplemental complaint alleges also that none of the interest accrued upon the bonds of the company, nor upon the bonds held by the State, has been paid since the commencement of this suit, which was about two years. The answer of defendant Holland consists of several statements of fact as defenses to the action.

The first three state the obtaining of his execution, his sale and purchase. He admits the previous execution and exchange of bonds as stated in the complaint. The fourth denies the execution by the J. P. & M. Company of any mortgage or deed of trust to the State to secure any of the bonds, and affirms that the mere execution by the company of the bond to the State did not create any lien, as well as that there was no constitutional power in the State (Legislature) to issue such bonds.

The act of the Legislature did not require at the hands of the company the execution of a formal mortgage or deed of trust in addition to its bond. The Legislature provided for a simple company bond, and declared that the State of Florida should, " by this act," have a statutory lien to secure the principal and interest of the said company bonds, which shall be valid to all intents and purposes as a first mortgage duly registered on the part of the road for which the State bonds were delivered. There was to be this statutory mortgage lien attached to the bond of the company in the hands of the State, and it was not contemplated that the company should execute a mortgage or deed of trust in addition to its bond. As to the matter of the constitutionality of the State bonds, we have already seen that while this may relieve the State from any obligation as a debtor, it does not relieve the company or the property in the hands of Holland, where it is affected by all the equities affecting it, when in the control of the company.

The fifth ground of defense states that the Governor of Florida has never designated any place in the city of New York where the bonds or coupons of the State might be paid. The act provides that the principal and interest of the State bonds should be payable at such place in the city of New York as the Governor shall designate, and that the coupon of the company bond shall be payable at the same place. The failure of the State to designate a place in New York for such payment does not constitute a defense to the action upon the part of the company or Holland. What is to be paid here is the coupon upon a bond authorized by a statute, and it is now well settled that such coupons have the incidents of negotiable commercial paper. Holland, while not denying that this interest is due, makes no tender of the money or offer of payment, nor does he allege that he was ever ready to pay at any time or place. The fact that no place has been designated does not excuse him from payment when demand is made through an action at

law or suit in equity. In ordinary cases of indebtedness even a tender and refusal of the sum due at the time and place where payable does not constitute a defense to the action. Such tender would not bar the debt. It could be pleaded only with a *profert in curia* of the money—17 Mass. 392; 14 Fla. 247.

The sixth alleges that the company was not in default in the payment of its interest when this action was commenced, because the company had paid the corresponding coupon upon the State bond. If the allegation was that the interest due upon the State bonds, as set up in the original, amended and supplemental complaints, had been paid by the company, the defense might have been good, viewing the State as a trustee, but the defense is only partial. The supplemental complaint against Holland, filed two years after the commencement of the action, sets up a default in non-payment of interest both by the company and State for this period. Neither the company nor Holland deny this default, and it is sufficient to give the right of action to the trustee.

The seventh defense has reference to the claim of the Trustees of the Internal Improvement Fund under the bonds issued under the internal improvement act of 1855.

The eighth denies that Greeley was ever legally in the possession of the road, and admits that the Jacksonville, Pensacola and Mobile Railroad Company was a corporation. It is only necessary to mention these facts to see that they constitute no defense.

The ninth alleges that the State of Florida "never in legal effect" issued or delivered a State bond. The bare naked statement of a legal opinion entertained by a pleader, as to facts not alleged as a matter of defense, amounts to nothing. So far as this proposes to set up the want of power in the Legislature to authorize the issue of the State bonds, the demurrer reaches that point by the simple statement in the complaint of the fact that they were issued,

and the legality of their issue is raised properly by the demurrer, and is improperly attempted to be raised by an answer stating the presumed "legal effect" of the act of issuing them.

The tenth alleges that the President of the Jacksonville, Pensacola and Mobile Railroad Company never made the certificate under oath required by the act of 1870, as preliminary to the issue of the bonds. The complaint alleges that such certificate was made. The issue made is immaterial. If the company received the State bonds and gave its own, neither it nor Holland can now be heard to urge its own default in the simple matter of failure to give a formal certificate. The company has had the benefit of everything it would have got with it, and it and Holland must be held to the corresponding liability.

This ends the consideration of the defenses set up in the answer of Holland. None of them constitute a defense to the action.

Objections to the levy and sale in this case have occurred to me, but I have not stated them, wishing, as far as this court was concerned, that we should take as broad a view of the whole matter as possible in order to the speedy conclusion of this controversy.

No question of jurisdiction has been raised by the pleadings or presented in the argument in this case. It is apparent from the pleadings that the road is now in the possession of the receiver of the Supreme Court of the United States. Upon the case made upon the demurrer, Holland having answered, and being within the jurisdiction of the Circuit Court of Duval county, the State has a clear equity to perpetually enjoin him from obstructing, or in any manner hindering, the Governor of the State from entering upon, taking possession of, and selling the road, in accordance with the terms of the statutes as in this opinion defined.

No question of priority of liens as between the bonds is-

sued under the internal improvement act, and the State, is involved or considered upon this appeal.

The judgment of the Circuit Court upon the demurrer should be affirmed.

BRYSON concurring:

The first question for us to decide is, has Holland any interest in the subject-matter of this suit? He alleges in his answer that he purchased the franchise of the Jacksonville, Pensacola & Mobile Railroad Company, or, at least, the equity of redemption. To this allegation there is a demurrer, which was sustained in the court below, and upon which this appeal is prosecuted. The demurrer then admits the facts and raises the issue of law, which it is our duty to decide. That a franchise cannot be sold under a *fi. fa.* has been determined so often, at least in this country, that there cannot be any better settled principle of law found. It is true that there is not any decision in our State, but the Supreme Court of the United States has decided this question; and Judge Taney, in delivering the opinion in the case of Robert Gue vs. Tide Water Canal Company, 24 Howard, 257, says: "A corporate franchise to take tolls on a canal cannot be seized and sold under a *fieri facias*, unless authorized by a statute of the State which granted the act of incorporation." And it will be seen that there is no such statute in this State.

Again he says: "Neither can the lands or works essential to the enjoyment of the franchise be separated from it and sold under a *fi. fa.*, so as to destroy or impair the value of the franchise." Ib.

In a North Carolina case the court holds: "We agree that the franchise itself cannot be sold." (5 Dev., 306, State vs. Reives.) The court in this case decided that the land upon which the road is built could be sold under a *fi. fa.*, for the reason that the Legislature had made no other povision by which debts could be collected, and say: "We

regret sincerely that it has hitherto escaped the attention of
these companies and of the Legislature that some act was
necessary in order that such sales, when unavoidable, might
be made with the least loss to the debtors and the greatest
advantage to the creditors and purchasers, by providing for
keeping the franchise with the estate.   Or, if it so please
the Legislature, an act might provide for putting the road
into the hands of a receiver, and subjecting the income to
the creditors, instead of the estate in the land stripped of
the franchise.   But nothing of this kind has been done."
State vs. Reives, 5 Dev. 307.

But it will be seen that the Legislature of Florida had
made such provisions, and pointed out the manner in which
a judgment creditor could collect his debt after he had ob-
tained a judgment. (Acts of 1870, sec. 374, amended in
1871, pamphlet, p. 13, 1832.)   And it is a well settled prin-
ciple that, when a statute prescribes the manner in which a
debt should be collected from a corporation, the statute
must be strictly pursued.   It will be seen that the decision
in North Carolina was made in 1844, long before the de-
cision in 24 Howard, 257, and has long since been overruled
in the North Carolina court and the ruling in 24 Howard
sustained, and that it is now settled that even a worn-out
rail and timber necessary for the repairs of the road are
exempt from levy and sale. (2 Redfield on Railways, 543,
note, and authorities referred to there.)   Thus it clearly
appears that the franchise, or anything which is necessary
to the enjoyment of all the rights pertaining thereto, cannot
be sold under an execution.

But the defendant, Holland, says he purchased the equity
of redemption.   If it could be possible that the equity of re-
demption could be sold under an execution, when the thing
itself could not, before making the mortgage or deed of trust,
it must be by statute, and we have no statute in this State
authorizing the sale of the franchise or the equity of redemp-
tion in a franchise.   It will be seen that we have a statute

authorizing the sale of the equity of redemption in property already subject to sale, but surely that cannot be construed to authorize the sale of the equity of redemption in property not subject to levy and sale. (Thomp. Dig. 355-6.) This statute is in derogation of the common law, and must be strictly pursued. The demurrer raises this question, and it was as much the duty of Holland to show that the statute had been complied with as it was to show that he had an execution. It will be seen that Holland does not allege in his answer that the statute has been complied with. Mr. Redfield, in his valuable work, "The Law of Railways," published in 1867, could only find one case where a sale of the equity of redemption in a railroad corporation had been sustained; but he does not tell us whether that was by virtue of a statute authorizing the sale of the equity of redemption in a railroad corporation, and I have not been able to get the report of the case. (Wood vs. Goodwin, 49 Maine R. 260 ; 2 Redfield on the Law of Railways, 546.) Then, as the statute authorizing the sale of the equity of redemption does not authorize the sale of the equity of redemption in a railroad corporation, and the requirements of the statute have not been complied with, it certainly cannot be maintained that Holland acquired any title under his sale and purchase, and, for that reason, the demurrer must be sustained, and the judgment of the court below affirmed.

The only other question which I desire to express an opinion upon, is, the constitutionality of the bonds issued and delivered by the State to the Jacksonville, Pensacola & Mobile Railroad Company. I have reached the same conclusion as Justice Westcott, but desire to give my own reasons. The Supreme Court of the United States very properly remark, " this is a delicate question," and all the circumstances surrounding and connected with this case render it a complicated and *very* delicate question. As that court remark, the judges of this court gave an official opinion, which was generally considered favorable to the constitutionality of these

bonds, and two of those judges are not here to speak for themselves ; one of them has passed away, and the other is disqualified to sit in this cause, and there is the further difficulty, to my mind, that none of the holders of these bonds are before the court, though the State—the trustee—which has the mortgage or first lien upon the road to enable it to finally pay the bonds, is before the court. If the bonds are invalid, they might have come into this court, or the court below, and asked to be subrogated in place and stead of the State, but they have not done so, and they have a right not to do so. There is one aspect of the case which makes it very much the duty of this court to pass, now, upon the validity of these bonds. If the holders were misled by the official opinion given by the justices of this court, they should know it at once, and take hold of whatever security may be in their power, and more especially so in this case, as the railroad, if they should see proper to resort to that, is deteriorating in value every day.

The question to be decided, then, is, is the act of the Legislature authorizing the Governor of the State to issue and deliver to the Jacksonville, Pensacola & Mobile Railroad Company the bonds of the State constitutional, and that must be done by reference to the statute and Constitution of 1868.

The Constitution of 1868, Section 7, Article XII., authorized the Legislature to provide for issuing bonds of the State, bearing interest, for securing the debt of the State, and for the erection of State buildings, support of State institutions, and *perfecting* the public works.

I think it may be conceded that perfecting the public works means, and was intended to mean, the uncompleted railroads and canal, designated as such by the internal improvement act of January, 1855.

The whole course of legislation then, and since that time, has so treated that system, and these roads as the public works of the State, because they were aided by the State.

Then the sole question here is, is the Jacksonville, Pensacola and Mobile Railroad one of these public works, designated by that act—I mean the act of the 6th of January, 1855? Two corporations accepted the provisions of that act, which were authorized to construct a road from the Apalachicola river west. The Pensacola and Georgia Railroad Company was to commence at the city of Pensacola, or some point on the Pensacola bay, running eastwardly to some point on the Georgia line. The other, the Florida, Atlantic and Gulf Central Railroad, to commence in East Florida, upon some tributary of the Atlantic ocean, within the limits of the State of Florida, and run through the State to some point, bay, arm, or tributary of the Gulf of Mexico, west of the Apalachicola river, in West Florida.

The internal improvement act provided that a railroad be built from the St. Johns river, at Jacksonville, to the waters of Pensacola bay, with an extension, at suitable points on said line, to St. Marks, or Crooked river at White Bluff, and Apalachicola bay in Middle Florida, and the waters of St. Andrew's bay in West Florida, &c. (Act of 1855, page 11, pamphlet.) The charter of the Jacksonville, Pensacola and Mobile Railroad, as amended, is "to build a road from the terminus of the late Pensacola and Georgia Railroad, now the Tallahassee Railroad, at Quincy, to the boundary line between the States of Florida and Alabama," &c. (Amended act of 1870.) It cannot be pretended that this is the terminus or starting point of either line of railroad which did accept the provisions of the internal improvement act.

The Jacksonville, Pensacola and Mobile Railroad does not mention the city of Pensacola or Pensacola bay, which are cardinal points in the Pensacola and Georgia charter, neither does it touch the Gulf of Mexico west of the Apalachicola river in West Florida, neither does it touch the cardinal point mentioned in the internal improvement act, the waters of the Pensacola bay, but runs north of that city

and bay, and extending to the Alabama line. It is very clear that part of this line and terminus is not named in the internal improvement act, or in the charter of either of the roads which had accepted the provisions of that act. Now it is very well remembered by some of us what induced the Legislature to make the City of Pensacola, or Pensacola bay, or the Gulf of Mexico, west of Apalachicola river, in the State of Florida, cardinal points in their charters, and in the internal improvement act.

It was contended then, whether it appears or not, I cannot tell, in the proceedings of the Legislature, that the State of Florida had natural advantages which she did not intend that others should enjoy, at least until her system, as inaugurated, was permanently established.

These are reasons that did or might have actuated the Legislature in establishing these particular cardinal points, and if it had not been done, might have defeated the whole system. But is this a sufficient deviation from the original system to put it beyond the power of the Legislature to extend the aid to the Jacksonville, Pensacola and Mobile Railroad Company? I think, under the reasons and holding of the courts in analogous cases, it is; for there is nothing like the present case to be found in the books, though the courts have time and again decided what variation from the original route or terminus would exonerate a previous subscriber from the payment for his stock.

The Supreme Court of the United States, in the case of Marsh vs. Fulton county, 10 Wall. 676, held that a subscriber to stock and issues of county bonds, authorized upon the vote of the people of the county, to the organized corporation, could not be legally made to pay their subscription to one of three roads made out of the one. Mr. Redfield uses this language in his work on the law of railways: There can be no doubt that the subscribers to the stock of a railway company are released from their obligation to pay calls by the fundamental alteration of the charter. (1 Red-

field on the Law of Railways, page 193, and cases referred to there; 11 Ga. 438; 5 Hill, 383.)

"If a person subscribes for the purpose of building a railroad between two given points, and this project is abandoned, the person is not liable to another company, who are authorized by an act of the Legislature to impose such subscription for another purpose, such act not being in the power of the Legislature to grant." (Angel and Ames on Corporations, Sec. 542; Pittsburgh & C. R. R. Co. vs. Gazzan, 32 Penn. State, 340.) The authorities of this kind might be multiplied to almost an indefinite number, but it is deemed unnecessary.

For the reason that this is a deviation from the system of internal improvement inaugurated by the internal improvement act, it clearly appearing that the charter to the Jacksonville, Pensacola and Mobile Railroad Company is for a different terminus, and part of the line entirely a different road from what was organized as the system of internal improvement in this State, and therefore cannot be considered as a part of that system.

In addition to all this, is there one word in the State Constitution, or in the advisory opinions of the Judges, which can be construed or tortured into the construction that the Legislature had power to authorize the *exchange* of the State bonds on a completed railroad?

"Section 7. The Legislature shall have power to provide for issuing State bonds, bearing interest, for securing the debt of the State, or for the erection of State buildings, support of State institutions, and perfecting public works."

There is not one word in the Constitution which can be *twisted* into a construction that the Legislature might provide for issuing the bonds of the State in exchange for the bonds of the railroad company, to aid it to maintain its road, or for any other purpose than the completion of the system inaugurated by the internal improvement act.

The act under which these State bonds were issued pro-

vided merely for an exchange or barter for the bonds of the railroad company, and no where contains any provision for the application of the State bonds, or their proceeds, to the purpose of perfecting any railroad or other public work. It is in substance and effect an attempt to endorse the bonds of a road already built—a thing not contemplated by the Constitution in any aspect. Then is the official opinion of the Judges calculated to mislead any one, or authorize the construction that they were in favor of the validity or constitutionality of these bonds?

As this will be better understood I may be pardoned for copying the inquiry of the Governor and the opinion in full of the Chief Justice.

[The Judge here read the advisory opinion of Chief Justice Randall in 13 Fla. 719.]

The question of the validity of these bonds was not before the Justices at the time they gave their advisory opinion. Now can there be found anything in this opinion which might lead to the conclusion that the bonds in question could be authorized to be issued by the Legislature? To my mind it is clear it is not.

I have copied and used the opinion of Judge Randall because Judge Wescott is here and fully able to speak for himself, and has done so. I do not copy the opinion of Judge Hart, because he has passed away, and his opinion is very short, and fully agrees with the gist of the other opinions.

For these reasons, and those of Judge Westcott's so logically and properly given, and with which I fully agree, I am compelled to come to the conclusion that these bonds are invalid, and were issued in violation of the Constitution, and that they are entirely null and void, and that the State is not bound to pay them, and that the State holds the lien upon the road as trustee for those bondholders.

I agree with Mr. Justice Westcott as to the equities and status of the State.

Goss concurring.

I concur with Judge Bryson in his opinion upon the question of the sale of a franchise, and with both the Justices upon the other points decided, and deem it unnecessary to give a separate opinion.